# Illinois Official Reports

## Appellate Court

---

**Carrillo v. Park Ridge Firefighters' Pension Fund, 2014 IL App (1st) 130656**

---

| | |
|---|---|
| Appellate Court Caption | KAREN CARRILLO, Plaintiff-Appellant, v. PARK RIDGE FIREFIGHTERS' PENSION FUND and THE BOARD OF TRUSTEES OF THE PARK RIDGE FIREFIGHTERS' PENSION FUND, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0656 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | December 20, 2013<br><br>February 5, 2014<br>February 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on plaintiff's application for a duty-related disability based on degenerative arthritis of her left knee that prevented her from performing her duties as a firefighter/paramedic, the Firefighters' Pension Board's decision to deny her application and award her a nonduty disability instead on the ground that her injury was due to her preexisting knee condition was upheld by the appellate court, since she failed to prove that an on-duty incident either caused or aggravated her preexisting condition and the Board's decision was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-21406; the Hon. Neil Cohen, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas W. Duda, of Law Offices of Thomas W. Duda, of Arlington Heights, for appellant. |
| | |
| | Carolyn Welch Clifford and Ericka J. Thomas, both of Ottosen Britz Kelly Cooper Gilbert & DiNolfo Ltd., of Naperville, for appellees. |
| | |
| Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, former firefighter/paramedic Karen Carrillo, age 40, sought disability benefits from the Board of Trustees of the Park Ridge Firefighters' Pension Fund (Board), based on degenerative arthritis of the left knee that rendered her unable to work. After holding a hearing on Carrillo's disability application, the Board concluded that Carrillo's injuries were due to a preexisting knee condition rather than any acts of duty. Accordingly, instead of awarding her duty-related disability, which would entitle her to a pension of 65% of her salary, the Board awarded her nonduty disability, which entitled her to a pension of only 50%. On administrative review, the circuit court upheld the Board's decision. Carrillo now appeals, contending that she is entitled to line-of-duty disability benefits. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On May 18, 2011, Carrillo filed her disability pension application with the Board. She sought a line-of-duty pension pursuant to section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2012)), which provides that if a firefighter is permanently disabled as a result of injury "resulting from the performance of an act of duty or from the cumulative effects of acts of duty," the firefighter shall be entitled to a disability pension equal to 65% of the salary attached to her rank on the date she is removed from the payroll. In the alternative, Carrillo sought a nonduty pension under Pension Code section 4-111 (40 ILCS 5/4-111 (West 2012)), which provides that the pension for a firefighter whose disability does not result from the performance of an act of duty shall be equal to 50% of her salary.

¶ 4    The Board held a hearing on Carrillo's disability application on March 12, 2012. Carrillo was the sole witness testifying at the hearing. Carrillo testified that she was hired by the city of Park Ridge as a firefighter/paramedic on February 14, 2000, and she continued working in

- 2 -

that capacity until May 2011, when she went off duty due to severe pain in her left knee. She stated that her treating physician, orthopedic surgeon Dr. David Mochel, had told her that she would need a total knee replacement.

¶ 5    Carrillo testified that prior to her employment with Park Ridge, she had undergone two arthroscopic surgeries to her left knee. The first surgery occurred in 1988, when she was 17, for a tear to her medial meniscus that she sustained while playing varsity basketball in high school. The second surgery occurred when she was 21, during her first intramural basketball season in college, for an injury to the medial compartment of her left knee. Both surgeries were due to pain that "started creeping up," rather than any distinct incident. Carrillo further testified that from 1996 until early 2000, she worked as an emergency medical technician and paramedic for Superior Ambulance. During that time, she did not experience any problems or require any treatment for her left knee.

¶ 6    As noted, Carrillo began her employment with Park Ridge as a firefighter/paramedic on February 14, 2000. She testified that she passed the Park Ridge preemployment physical with no reservations as to her health. She then described her job duties as a firefighter/paramedic. In her capacity as a firefighter, on a regular basis, she would have to put on fire protection gear and a self-contained breathing apparatus (SCBA) that weighed approximately 65 pounds. She would also have to advance a hose by herself or with another firefighter; when filled with water it could weigh over 100 pounds. She would frequently need to breach doors, walls, or ceilings from a crawling or a standing position. If she needed to go to the roof, she would carry a ladder weighing 50 to 80 pounds, plus a roof ladder weighing 20 pounds. As for her paramedic duties, she would have to carry various kinds of equipment, such as cardiac monitors weighing 20 pounds or bags weighing 30 pounds. She would also work with a partner to carry patients on cots, sometimes up and down stairs, and transfer them from cots to ambulance beds.

¶ 7    Carrillo then testified about the events occurring during her employment with Park Ridge that she alleged led to her current disability. She stated that in January 2002, while she was performing her paramedic duties, she stepped out of an ambulance and felt "a lot of pain" in her left knee. She subsequently received medical care from orthopedic specialist Dr. Matthew Gimre and Dr. Mochel. Right after the injury, she missed a couple of days of work, but after that, she continued working as a firefighter/paramedic. On October 15, 2002, she had arthroscopic surgery performed on her left knee by Dr. Asselmeier, a physician within her HMO group. The surgery caused Carrillo to miss two or three months of work before returning to work in December or January. The pain in her knee prevented her from doing long distance running or full court basketball, but she was still able to perform her duties as a firefighter/paramedic.

¶ 8    Carrillo stated that a second injury incident happened in July 2005, when she was helping to lift a patient's cot into the back of an ambulance. She stated that the patient's caretaker stepped up to enter the ambulance, and the rear step of the ambulance "was slammed down onto [her] left knee," causing her severe pain. Carrillo filled out an injury report for the incident but did not seek medical attention.

¶ 9    Carrillo filed a third injury report on March 26, 2006. On that day, she was carrying a patient on a stretcher. The patient weighed approximately 200 pounds. Carrillo was at the foot of the stretcher, walking backwards. When trying to ascend a flight of four or five steps, Carrillo twisted her knee and was unable to complete the lift due to pain. She stated that she was not able to finish her shift. Instead, she obtained medical treatment and stayed off duty for several shifts afterwards.

¶ 10    After that incident, Carrillo testified that she returned to work as a firefighter/paramedic until May 2011. She stated that from January to May of 2011, she started having increasing pain in her left knee. In May 2011, she was sent to deal with a garage fire. The ambulance was parked approximately half a block away from the fire scene, and when Carrillo put on her fire protection gear and SCBA, she had difficulty walking the half-block to the fire. She was also unable to kneel on her left knee so that she could crawl into the garage to advance the hose. "And at that time," she said, "I felt that I not only was hurting myself but I was going to hurt somebody else also." She stated that she did not experience any specific injury on that date; rather, that was the point where her ongoing symptoms became intolerable.

¶ 11    Carrillo stated that she was examined by a doctor and obtained a light-duty slip. Initially she did not give the slip to the city, but continued working as normal, because she felt that her knee might get better. Eventually she gave the light-duty slip to her chief on May 17, 2011. She requested light duty, but she was told there was no light duty available. She stated that she had been off work with no benefits since that day.

¶ 12    In addition to hearing Carrillo's testimony, the Board also considered reports from various doctors about the cause of Carrillo's condition. The first such report was from Dr. Brian Cole, a board-certified orthopedic surgeon who provided an independent medical examination (IME) of Carrillo after the 2002 incident. In his report, Dr. Cole stated:

> "It is my opinion that she has a significant preexistent problem with a low-level mechanism of injury that has aggravated this preexistent problem. I described to her that this could have happened in the workplace and outside the workplace. But given it happened in the workplace, it appears at this point to be within the realm of a work-related injury. I did tell her that her knee is a relative time bomb in that the absence of the meniscus in a relatively young, active woman, there is a greater than 50 percent chance that at some time she would go on to develop problems. *** One hundred percent of the pathology present in her knee at this time, in my opinion, is and should be considered due to her preexisting problem."

He explained that the incident that caused Carrillo's injury, stepping down from the ambulance, was "relatively innocuous low-level trauma" that potentially could have occurred either at work or while performing activities of daily living. "[B]asically," he said, "it is a timing issue that she stepped while at work when the onset of pain began." He further stated that, because of her preexisting condition, "this is not in my opinion a hard and fast work-related injury."

¶ 13    The Board also considered reports from three additional doctors–Dr. Mark Hutchinson, Dr. Daniel Samo, and Dr. Pietro Tonino–who performed IMEs of Carrillo pursuant to section

4-112 of the Pension Code (40 ILCS 5/4-112 (West 2012)). All three doctors certified that Carrillo was permanently disabled.

¶ 14    In his report, Dr. Hutchinson, a specialist in orthopedic surgery, concluded that Carrillo's long-term disability, while possibly exacerbated temporarily by the 2002 incident, was more likely related to her preexisting condition. Based on his examination of Carrillo and a review of her medical records and history, he opined:

> "This disability is based on her severe degenerative arthritis that began long before the incident in question in 2002. I would agree with Dr. Brian Cole who provided the previous IME in which he felt the knee was a time-bomb waiting to happen. It is more likely true than not that Ms. Carrillo would have had progressive pain and dysfunction in her knee regardless the accident in question. ***
>
> Based on my review of the medical records including arthroscopy report after the injury in question, I believe that the accident in question could have exacerbated the underlying degenerative knee. In the absence of pre and post imaging or arthroscopy, it is not possible to conclude with certainty whether the arthroscopic findings including complex degenerative meniscus tear were aggravated by the event or was already present at the time of the event. I am convinced that the ultimate outcome for Ms. Carrillo is unrelated to the event as she was more likely to progress to symptomatic degenerative arthritis regardless the event in question."

¶ 15    The second physician, Dr. Samo, who specializes in occupational health, stated in his report that it was not medically possible that Carrillo's disability was caused by an act of duty or the cumulative effects of acts of duty.

> "I believe that she had severe medial compartment arthritis at the time of her injury 1/20/02. This incident didn't [*sic*] cause a temporary aggravation of her condition, but it seems that she returned to her baseline thereafter. She has been having continuing degeneration of the medial compartment of her left knee. This is the natural history of this problem. It is due to the multiple surgeries which she had as a teenager."

¶ 16    The third physician, orthopedic surgeon Dr. Tonino, opined within a reasonable degree of medical certainty that the condition of Carrillo's left knee was "caused or aggravated" by the 2002 incident, "based on the fact that she was seen immediately after the injury because of an acute knee injury at that point."

¶ 17    Finally, the Board considered office progress notes from Dr. Gimre and Dr. Mochel, both of whom treated Carrillo following the 2002 incident. In his notes on Carrillo's office visit on January 24, 2002, Dr. Gimre stated that Carrillo was experiencing "[l]eft knee pain, likely secondary to exacerbation of the medial meniscus." He saw Carrillo again on February 15, 2002, after which he stated that Carrillo had "[l]eft knee pain status post recent injury that likely involved exacerbation of the medial meniscus tear, improving." Subsequently, Dr. Mochel examined Carrillo on May 3, 2002, and he wrote the following in his progress notes: "Karen is here today for evaluation of her left knee. She saw Dr. Gimre in January of this year for a work related injury. *** I think that Karen has exacerbated her underlying arthritis with her injury."

¶ 18    Upon consideration of this evidence, the Board issued an order concluding that Carrillo was permanently disabled, but no on-duty incidents during Carrillo's career had been shown to have caused, or to have been a contributing causative factor to, her disability. It stated that Carrillo suffered from degenerative arthritis of the medial compartment of her left knee, which was related to her history of injuries and associated surgeries during her high school and college basketball career. It further stated that this degenerative arthritis was the ultimate cause of Carrillo's disability, and Carrillo had failed to prove that this degenerative arthritis was caused or aggravated by job-related trauma. It issued a specific finding that the three on-duty incidents described in Carrillo's testimony did not aggravate the condition of her knee, explaining:

> "The Plaintiff recovered from each incident, returned to full, unrestricted duty, and was able to perform her duties as a firefighter/paramedic for the Park Ridge Fire Department. The Plaintiff submitted no evidence that her knee condition, or any other injuries, required her to miss work in 2007, 2008, 2009 or 2010."

The Board therefore granted Carrillo a nonduty pension.

¶ 19    On June 8, 2012, Carrillo filed a complaint for administrative review of the Board's decision in the circuit court, contending that the Board erred in not finding her eligible for a line-of-duty pension. The circuit court upheld the Board's decision. Carrillo now appeals, contending, as she did before the court below, that her disability is the result of acts of duty and she is therefore entitled to a 65% line-of-duty pension under section 4-110 of the Pension Code (40 ILCS 5/4-110 (West 2012)).

¶ 20                                    II. ANALYSIS

¶ 21    The Pension Code provides that judicial review of pension board decisions is governed under the terms of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)). 40 ILCS 5/3-148 (West 2012). Under the Administrative Review Law, we may not consider new or additional evidence beyond what was originally presented to the Board, and the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2012). Accordingly, we defer to the Board on questions of fact unless its findings are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007) (citing *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006)); *Jones v. Board of Trustees of the Police Pension Fund*, 384 Ill. App. 3d 1064, 1067 (2008). If the record contains evidence that supports the Board's factual conclusions, then we shall not disrupt those conclusions, even if an opposite conclusion is reasonable. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 538 (1997). Where there is a mixed question of law and fact, we defer unless the Board's ruling is clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392 (2001) (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)); *Wade*, 226 Ill. 2d at 505 (citing *Marconi*, 225 Ill. 2d at 532); *Jones*, 384 Ill. App. 3d at 1067. This is a less deferential standard than the manifest weight of the evidence standard, yet still "significantly

deferential": we will find the Board's decision "clearly erroneous" only where we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Regardless of the standard of review, plaintiff bears the burden of proof and will be denied relief if she fails to meet that burden. *Wade*, 226 Ill. 2d at 505 (citing *Marconi*, 225 Ill. 2d at 532-33).

¶ 22    The parties disagree as to the standard of review to be applied in this case. Carrillo argues that the clearly erroneous standard is proper, while the Board argues that the manifest weight of the evidence standard is proper, such that we defer to its findings unless an opposite conclusion is clearly evident (*Wade*, 226 Ill. 2d at 504-05). We agree with the Board. Where, as here, the sole issue is whether a work-related incident is a cause of a claimant's disability, this is a purely factual determination which we review under the manifest weight of the evidence standard. See, *e.g.*, *id.* at 505; *Marconi*, 225 Ill. 2d at 543. However, we note at this juncture that our decision in this case would be the same even under the clearly erroneous standard.

¶ 23    It is well established that in order to obtain a line-of-duty pension, "[a] claimant need not prove that a duty-related accident is the sole cause, or even the primary cause, of his disability." *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543, 550 (2002) (citing *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818 (1993) ("There is no requirement that the duty-related incident be the originating or primary cause of the injury, although a sufficient nexus between the injury and the performance of the duty must exist.")). Rather, the claimant only needs to prove "that the duty-related accident is a causative factor contributing to the claimant's disability." *Luchesi*, 333 Ill. App. 3d at 550. In particular, a line-of-duty pension may be based upon the duty-related aggravation of a claimant's preexisting physical condition. *Wade*, 226 Ill. 2d at 505; see also *Rose v. Board of Trustees of the Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 92; *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003) ("even though an employee has a preexisting condition which may make him more vulnerable to injury, recovery for an accidental injury will not be denied as long as it can be shown that the employment was also a causative factor").

¶ 24    Carrillo argues that the Board's finding that no on-duty incidents during her career either caused or were a contributing causative factor to her disability is against the manifest weight of the evidence. Based upon our review of the record, including the transcript of the hearing before the Board and the various medical reports submitted in this case, we disagree. We find that there was sufficient evidence in the record to support the Board's conclusion. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992) (under the manifest weight of the evidence standard, "[i]f the record contains evidence to support the agency's decision, it should be affirmed").

¶ 25    We begin by considering the events that occurred prior to Carrillo's disability. The parties agree that Carrillo had a preexisting physical condition that contributed to her disability, namely, degenerative arthritis of the left knee. Carrillo, however, argues that this

- 7 -

preexisting condition was aggravated by on-duty incidents that occurred in 2002, 2005, and 2006. To recap briefly, the first incident, in 2002, occurred when Carrillo stepped out of an ambulance and felt pain in her left knee. Carrillo had knee surgery later that year and was absent from work for two or three months afterwards. However, she then returned to work with no restrictions on her firefighter/paramedic duties. She reported no further difficulties until the second incident, in 2005, when she was loading a patient into an ambulance and the rear step of the ambulance was slammed down onto her left knee. She filled out an injury report but did not seek medical attention or miss any time from work. Finally, the third incident occurred in 2006, when Carrillo twisted her knee while carrying a patient backwards on a stretcher. She obtained medical treatment and stayed off duty for the next few shifts, but then once more returned to work as a firefighter/paramedic without restriction. It was not until nearly five years after this incident, in January 2011, that Carrillo started experiencing increasing pain in her left knee that eventually rendered her unable to perform her duties.

¶ 26    In light of this history, the Board found that Carrillo failed to prove that the on-duty incidents were "a causative factor" (*Luchesi*, 333 Ill. App. 3d at 550) leading to her disability. Nor do we find this factual determination to be incompatible with the record. As noted by the Board in its decision, Carrillo recovered from each of these incidents and returned to full, unrestricted duty as a firefighter/paramedic. Indeed, she was able to work for nearly five years after the last of these incidents with no apparent problems in performing her duties, until she began to spontaneously experience difficulties with her left knee in January 2011.

¶ 27    Carrillo argues that, if the causal link between her 2011 disability and her on-duty incidents is tenuous, then the link between her disability and her preexisting condition is even more tenuous, since her surgeries for that preexisting condition occurred much longer ago, in 1988 and 1991. This argument implicitly misstates the burden of proof. The Board did not have the burden of proof to establish that Carrillo's preexisting condition was the sole cause of her disability. Rather, Carrillo, as the claimant, had the burden of proof to establish that there was a causal connection between an act or acts of duty and her disability. *Wade*, 226 Ill. 2d at 505; *Marconi*, 225 Ill. 2d at 532-33. She was required to prove that an on-duty incident either caused or aggravated her preexisting condition and cannot say that there was not sufficient evidence for the Board to make a finding that an on-duty incident did not cause or aggravate her preexisting condition resulting in her disability. In other words, we cannot say that the Board's decision was against the manifest weight of the evidence.

¶ 28    Carrillo next urges that the facts of the present case are similar to those in *Sisbro*, 207 Ill. 2d at 207, where our supreme court upheld a decision to grant disability benefits to an employee under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2000)). Because the Pension Code was enacted to provide police officers and firefighters with benefits similar to those provided to employees under the Workers' Compensation Act, the standards developed under that act are applicable in pension cases. *Kellan v. Board of Trustees of the Firemen's Pension Fund*, 194 Ill. App. 3d 573, 581-82 (1990) (citing *O'Donnell v. City of Chicago*, 126 Ill. App. 3d 548, 552 (1984)).

¶ 29    The *Sisbro* claimant was a delivery truck driver with diabetes. *Sisbro*, 207 Ill. 2d at 197. On March 26, 1998, he twisted his right ankle when he stepped down out of his truck and into a pothole. *Id.* at 197-98. He felt pain and observed swelling in his ankle. *Id.* at 198. Over the next few weeks, his ankle swelled repeatedly and the swelling would not resolve. Based upon tests taken by his podiatrist on April 24, 1998, he was diagnosed with a condition known as Charcot osteoarthropathy. He then sought disability benefits. At the hearing on his claim, one doctor opined that his condition was due to his preexisting diabetes rather than any work-related incident; a second doctor opined that the March 26 incident was a contributing factor. *Id.* at 199-200. The Industrial Commission found the second doctor to be more credible and awarded disability benefits to the claimant. *Id.* at 200. The *Sisbro* court found that this determination was not against the manifest weight of the evidence, stating: "It is true that [the employer] presented conflicting expert testimony, but it was within the province of the Commission to judge the credibility of the witnesses, to draw reasonable inferences from their testimony, and to resolve any conflict in claimant's favor." *Id.* at 207.

¶ 30    *Sisbro* is distinguishable from the present case because the *Sisbro* claimant was able to draw a direct causative line from his work-related accident to his diagnosis of Charcot osteoarthropathy approximately one month later. The chain of causation is significantly more tenuous in the instant case. As noted, Carrillo was able to return to work after each of the three on-duty incidents where she experienced issues with her knee, and she was able to work without incident for nearly five years after the last of the three incidents. Even more importantly, in *Sisbro*, the court was reviewing the Commission's decision to grant benefits, not to deny them, and it treated the Commission's factual determinations with considerable deference pursuant to the manifest weight of the evidence standard. *Id.* We must grant similar deference to the Board's factual determinations in the present case, particularly with regard to the conflicting medical evidence presented to the Board on the cause of Carrillo's disability.

¶ 31    We turn now to examine that medical evidence. The Board considered reports or office progress notes from six doctors. Of those six, two of them (Dr. Samo and Dr. Hutchinson) opined that the on-duty incidents complained of by Carrillo did not aggravate her preexisting knee problems which caused her disability. Dr. Samo stated unequivocally that it was not possible that Carrillo's disability was caused by an act of duty or the cumulative effects of acts of duty. He explained that Carrillo already had severe medial compartment arthritis at the time of the first incident, in 2002. "This incident didn't [*sic*] cause a temporary aggravation of her condition," he said, "but it seems that she returned to her baseline thereafter." Dr. Hutchinson, meanwhile, stated that while Carrillo's knee condition might have been temporarily exacerbated by the 2002 incident, it was more likely a result of her preexisting condition. He concluded that "I am convinced that the ultimate outcome for Ms. Carrillo is unrelated to the [2002] event." He did, however, admit that it was not possible to conclude with certainty whether the 2002 event caused any aggravation in the absence of pre-and postimaging and arthroscopy. The remaining four doctors (Dr. Cole, Dr. Tonino, Dr. Gimre, and Dr. Mochel) opined that Carrillo's degenerative knee condition was aggravated or exacerbated by the 2002 incident.

¶ 32   Carrillo goes to great lengths in her brief to construe Dr. Hutchinson's report as being favorable to her, or, in the alternative, convince us that it should be accorded little weight. She first argues that Dr. Hutchinson "expressly agreed with and virtually adopted the opinion of" Dr. Cole, who opined that the 2002 incident aggravated Carrillo's preexisting knee condition. This is a misstatement of the record. Dr. Hutchinson's statement regarding Dr. Cole is as follows: "I would agree with Dr. Brian Cole who provided the previous IME in which he felt the knee was a time-bomb waiting to happen. It is more likely true than not that Ms. Carrillo would have had progressive pain and dysfunction in her knee regardless the accident in question." Thus, in context, it is apparent that Dr. Hutchinson is not adopting Dr. Cole's opinions wholesale, but merely that portion of his report in which he refers to Carrillo's left knee as a "time bomb."[1]

¶ 33   Carrillo next argues that, to the extent that Dr. Hutchinson's report is not favorable to her, it was based on mere speculation and conjecture and should therefore be disregarded. She bases this argument upon Dr. Hutchinson's statement that it is not possible to conclude with certainty whether the 2002 event aggravated her arthritis. However, Dr. Hutchinson made clear elsewhere in his report that, even if he could not speak with absolute certainty, it was his medical opinion that Carrillo's disability was "more likely" caused by her preexisting condition. It was permissible for Dr. Hutchinson to express his opinion in terms of probability instead of absolute certainty. See *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 372 (2005) (citing *McKenzie v. SK Hand Tool Corp.*, 272 Ill. App. 3d 1, 8-10 (1995) (it is reversible error to exclude a medical opinion stated in terms of probability or possibility as incompetent evidence)).

¶ 34   Thus, it is apparent that the medical evidence in this case was divided on the issue of causation, and the Board chose to believe the opinions of Dr. Samo and Dr. Hutchinson rather than the opinions of the remaining four doctors. We cannot say that this conclusion was against the manifest weight of the evidence. In this regard, we are guided by *Marconi*, 225 Ill. 2d at 543, in which the court upheld the Board's decision to deny plaintiff a disability pension. In that case, three doctors opined that plaintiff was disabled, while a single doctor opined that he was not. *Id.* at 504-21. The Board chose to believe that fourth doctor, stating that he gave the " 'most credible and persuasive evaluation' " of the plaintiff. *Id.* at 541. Although the Board's decision to deny benefits reflected the minority viewpoint among the doctors who evaluated the plaintiff, the *Marconi* court stated: "[T]he Board's decision to deny plaintiff a disability pension was not against the manifest weight of the evidence. The record contains sufficient evidence to support the Board's decision, and we cannot say that it is clearly evident that the Board should have reached the opposite conclusion ***." *Id.* at 543; see also *Village of Oak Park*, 362 Ill. App. 3d at 373 (affirming pension board decision although the evidence in favor of their decision "may not be overwhelming," since their

---

[1]We note parenthetically that even if Carrillo's knee were a "time bomb," in that her preexisting condition rendered it unusually susceptible to minor trauma, she would still be entitled to recovery if her employment was a causative factor in her disability. See *Sisbro*, 207 Ill. 2d at 204. However, as noted, the Board explicitly found that it was not.

decision was supported by competent evidence and reasonable inferences that could be drawn therefrom). Similarly, in the present case, the record contains sufficient evidence to support the Board's conclusion that no act of duty was a contributing causative factor to plaintiff's disability.

¶ 35    Notwithstanding the foregoing, Carrillo argues that the instant case is analogous to *Wade*, 226 Ill. 2d at 507-08, *Rose*, 2011 IL App (1st) 102157, ¶ 97, and *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446 (2009), in which the court found that the Board's decision to deny the plaintiff a line-of-duty pension was against the manifest weight of the evidence. For the reasons that follow, we find these cases to be distinguishable.

¶ 36    The facts of *Wade* are as follows. In April 2002, plaintiff, a police officer, fell down a hill while escorting a prisoner. *Wade*, 226 Ill. 2d at 491. He experienced pain and swelling in his right knee, and an MRI revealed two tears in the knee. He had surgery in May 2002 and was not thereafter able to return to full duty as a patrolman. He acknowledged that he had preexisting problems with his right knee, including a 1989 football-related injury and surgery in 1997 following a baseball-related injury. *Id.* at 492-93. X-rays taken in 1992 revealed " 'scant early degenerative changes' " in plaintiff's knees. *Id.* at 493.

¶ 37    Four doctors (Dr. Pavlatos, Dr. Levin, Dr. Dwyer, and Dr. Reger) found the *Wade* plaintiff to be disabled. *Id.* at 496-99. Dr. Pavlatos stated that plaintiff's condition " 'could [have] been aggravated' " by the 2002 work incident. *Id.* at 496. Drs. Levin, Dwyer and Reger all affirmatively stated that plaintiff's condition was either caused or aggravated by the work incident. *Id.* at 498-99. A fifth doctor, Dr. James Milgram, was the sole dissenter, finding that plaintiff was not disabled and that the tears in his knee were due to a preexisting condition. *Id.* at 501. However, in his report, Dr. Milgram made multiple misstatements of the evidence which showed that he either "selectively disregarded, failed to recall, or never reviewed portions of plaintiff's medical records." (Internal quotation marks omitted.) *Id.* at 506. The *Wade* court found that Dr. Milgram "was not credible, because his conclusions were inconsistent with the facts available to him" and therefore the Board erred in relying solely upon his opinion to deny plaintiff a line-of-duty disability pension. (Internal quotation marks omitted.) *Id.* at 507-08.

¶ 38    *Wade* is distinguishable from the present case in two key aspects. In *Wade*, the Board rested its decision upon the testimony of a single doctor whose credibility was highly questionable. By contrast, in the present case, both Dr. Samo and Dr. Hutchinson opined that Carrillo's disability was not related to any work-related incident or incidents. Moreover, Carrillo presents no reason to question the credibility of Dr. Samo and Dr. Hutchinson. There is no indication in the record that their conclusions are inconsistent with the facts available to them, unlike the opinions of Dr. Milgram that had no credible medical basis. In the absence of any such indicia of unreliability, the Board was entitled to believe the opinions of Dr. Samo and Dr. Hutchinson instead of the doctors whose reports were favorable to Carrillo. See *Sisbro*, 207 Ill. 2d at 207 (where parties presented conflicting expert testimony on causation, it was within the province of the Commission to judge the credibility of the

- 11 -

witnesses and to resolve any conflicts in their testimony); *Marconi*, 225 Ill. 2d at 543; *Village of Oak Park*, 362 Ill. App. 3d at 371.

¶ 39 The facts of *Rose* are similar to those in *Wade*, and thus similarly distinguishable from the present case. On February 1, 2004, the *Rose* plaintiff, a police officer, was injured in an automobile accident while on patrol. *Rose*, 2011 IL App (1st) 102157, ¶ 1. Subsequently, on June 1, 2004, plaintiff was involved in a separate and undisputably off-duty automobile accident. Following this second accident, plaintiff suffered extreme back pain that eventually caused him to leave the police department. *Id.* ¶¶ 27-33. The Board denied him a line-of-duty disability pension, finding that he had fully recovered from his initial on-duty February 2004 accident before he incurred injuries in the off-duty June 2004 accident. *Id.* ¶ 97. The *Rose* court found this to be against the manifest weight of the evidence. The court stated that eight out of nine physicians who offered opinions as to the cause of the petitioner's disability concluded that the February 2004 accident contributed to the plaintiff's disability. *Id.* ¶ 98. The ninth physician, Dr. Gleason, never conducted a physical exam of the plaintiff, and the facts as stated in his report were directly contradicted by the notes of the petitioner's family physician. *Id.* ¶ 105. Aside from Dr. Gleason's report, there was no evidence in the record to support the denial of line-of-duty disability benefits. *Id.* ¶ 98. These facts are markedly different from the present case, where the Board relied on reports from two different doctors who each personally examined the plaintiff and whose credibility was not impeached.

¶ 40 Finally, the case of *Kouzoukas*, 234 Ill. 2d 446, is even more dissimilar to the instant case than *Wade* and *Rose*. The *Kouzoukas* plaintiff, a police officer, injured her back while on patrol when she attempted to move an intoxicated man off the sidewalk. *Id.* at 448. The Board denied her subsequent application for disability benefits, finding that she was not disabled and that she had not shown a causal connection between her injury and the patrol incident. *Id.* at 462. The *Kouzoukas* court found both of these determinations to be against the manifest weight of the evidence, explaining: "From the outset, *every medical professional* who examined Kouzoukas found that she suffered pain as a result of a lower back strain that occurred on July 25, 2004, and that the pain, in turn, prevented her from returning to work as a full duty police officer." (Emphasis added.) *Id.* at 467. *Kouzoukas* is strikingly dissimilar to the instant case, where the medical testimony is not unanimous as to the cause of the claimant's disability, and, in fact, the Board's decision is supported by the reports of two independent medical examiners.

¶ 41 Therefore, for the foregoing reasons, we find that the Board's decision to deny Carrillo a line-of-duty disability pension and instead grant her a nonduty pension was not against the manifest weight of the evidence. The decision of the Board and the judgment of the circuit court is affirmed.

¶ 42 Affirmed.