# Illinois Official Reports

## Appellate Court

*McCumber v. Board of Trustees of the Oswego Fire Protection District Firefighters' Pension Fund*, 2019 IL App (2d) 180316

| | |
|---|---|
| Appellate Court Caption | BRIAN McCUMBER, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE OSWEGO FIRE PROTECTION DISTRICT FIREFIGHTERS' PENSION FUND, and MARK FLOYD, CRAIG EVANS, MIKE VESELING, and JOHN CORNISH, in Their Official Capacities as Members of the Board of Trustees, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-18-0316 |
| Filed | March 8, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 17-MR-30; the Hon. Robert P. Pilmer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas S. Radja Jr., of Collins & Radja, of Naperville, for appellant.<br><br>Charles H. Atwell, of Atwell & Atwell Law Offices, of Aurora, for appellees. |

JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices McLaren and Jorgensen concurred in the judgment and opinion.

# OPINION

¶ 1       Plaintiff, former firefighter Brian McCumber, sought a line-of-duty disability pension from defendant, the Board of Trustees of the Oswego Fire Protection District Firefighters' Pension Fund (Board), based upon a psychological condition that manifested symptoms during three separate training exercises. After a hearing, the Board denied plaintiff's request for a line-of-duty disability pension. Although it agreed that plaintiff was disabled such that he was unable to perform full-service duties for the Oswego Fire Protection District (District), the Board concluded that plaintiff's disability was neither caused nor exacerbated by his employment as a firefighter. Instead, it found that the psychological symptoms plaintiff experienced during the training exercises were "pre-existing and/or caused by external non-work related stressors." On administrative review, the circuit court confirmed the Board's decision. Plaintiff appeals, arguing that the Board (1) failed to properly apply a "causative factor" analysis, (2) erred in denying him a line-of-duty disability pension, and (3) violated his substantive due process right to a fair and impartial hearing. For the reasons below, we affirm.

¶ 2                                          BACKGROUND

¶ 3       On September 2, 2009, plaintiff was hired as a full-time firefighter/paramedic for the District and was effectively installed as a member of the pension fund. Previously, plaintiff worked for the District for a number of years as a part-time contract firefighter/paramedic.

¶ 4       On November 30, 2015, plaintiff filed an application for disability benefits with the Board, seeking a line-of-duty disability pension pursuant to section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2014)). Plaintiff alleged a psychological disability, namely anxiety disorder, based on difficulties he experienced during three training exercises on October 29, 2014; March 19, 2015; and May 21, 2015.

¶ 5       The Board held a hearing on plaintiff's application on December 14, 2016. Plaintiff was the only witness to testify. The Board received into evidence numerous exhibits, including plaintiff's complete personnel and medical records, injury reports for the incidents identified on plaintiff's application, and medical reports prepared by three physicians selected by the Board to evaluate plaintiff.

¶ 6                                   Plaintiff's Testimony

¶ 7       Plaintiff testified at the hearing as follows. He passed a physical evaluation when he was hired as a full-time firefighter/paramedic, and the District did not find that he had any psychological problems at that time. Between 2010 and 2014, he was called upon to fight between 12 and 20 structure fires, and he did not have any issues with anxiety or hyperventilation during those calls. He also responded to calls for service, including fighting fires, when he worked part-time for the District. Likewise, he did not have any problems with anxiety or other psychological problems during that time.

¶ 8    On October 29, 2014, plaintiff was assigned to attend training, which consisted of live fire training evolutions. He was assigned to rescue a mannequin from the basement of a training tower and to respond as if it were an actual emergency. Plaintiff was dressed in full bunker gear, including a self-contained breathing apparatus (SCBA). During the training exercise, while he was pulling the "victim" up the stairs, plaintiff became disoriented, felt overexerted and lightheaded, and had difficulty breathing. He notified his lieutenant that he needed assistance pulling the "victim" up the stairs. A "mayday" call was issued, and the training drill was halted. He was taken by ambulance to a hospital and was treated and released that same day.

¶ 9    The injury report for this incident included written statements from two firefighters who observed plaintiff during the training exercise. One firefighter said that he and plaintiff were in the process of carrying the "victim" up the stairs but that plaintiff ceased his efforts with "two steps to go." The firefighter believed that plaintiff was "physically spent," and he told him that they would exit the building. As they approached the exit window, plaintiff "ripped his mask off" and stated that he was having trouble breathing. According to the injury report, the other witness firefighter stated that he first observed plaintiff as he was being helped to the exit window, at which point plaintiff "fell to a knee and pulled his mask from his face," even though he was "still in an [immediate-danger-to-life-and-health (IDLH)] atmosphere at this time." This firefighter stated that plaintiff appeared "very exhausted and [was] experiencing a hard time catching his breath."

¶ 10    Plaintiff testified that, following this incident, he was advised to follow up with his primary-care physician, Dr. Brian A. Adrian, as well as the District's occupational doctor, Dr. Williamson-Link. Plaintiff missed several weeks of work following this incident, but he returned to work on December 10, 2014. He testified that he had not experienced shortness of breath or anxiety at work prior to this event.

¶ 11    On March 19, 2015, while engaged in another live-fire training exercise, plaintiff experienced similar difficulties. Plaintiff's assignment was search and rescue. During this training exercise, he and another firefighter rescued one "victim" from the structure and then reentered the structure and proceeded up the stairs to the second floor. Plaintiff told the other firefighter that he "was having a hard time catching [his] breath and that [he] was a little disoriented." Plaintiff then began to hyperventilate and "became kind of panicky." The training exercise was then stopped, and a "mayday" call was again initiated. Plaintiff was helped out of the structure and transported to the hospital, where he was given intravenous fluids and released that same day. He testified that the symptoms he experienced that day were more severe than the symptoms he had experienced during the October 29, 2014, training exercise.

¶ 12    The injury report for this incident noted that plaintiff began to stare at an interior wall and appeared to be looking for a way out. Plaintiff stated that he could not catch his breath, and he seemed disoriented. Plaintiff was assisted downstairs, and while he was on the first floor, plaintiff asked to remove his mask but other firefighters did not allow him to due to the dangerous atmosphere.

¶ 13    Plaintiff was again referred by the District to Dr. Williamson-Link. Plaintiff missed some time from work following this incident, and he worked in a light-duty capacity when he returned.

¶ 14    On May 21, 2015, plaintiff reported to another live-fire training exercise so that he could be evaluated in order to return to work in a full capacity. He assumed that a supervisor had ordered him to attend the training, and he was nervous because a union representative had informed him that it "wasn't going to be good for [him]" if the training did not go well. As in the March 19 incident, plaintiff was assigned to search and rescue, and he wore full turnout gear, including an SCBA. During the training exercise, plaintiff and another firefighter found the "victim" inside the structure and pulled him out. Plaintiff was "a little disoriented" and, when they reentered the structure, plaintiff tripped on what he thought was a hose line and "caught" himself on a recliner. The other firefighter then said "[s]omething's not right. You don't look right." Another "mayday" was called, and plaintiff was again helped out of the structure and transported to the hospital. He did not return to work following this event.

¶ 15    According to the injury report for this incident, plaintiff was observed "having a coordination issue while removing the victim" and "walking with a stagger and unsteady gait." Plaintiff then "became very unsteady in his gait and collapsed face forward into a recliner chair." A firefighter then "grabbed [plaintiff] by the back of his SCBA and stood him up" before the "mayday" call was issued and plaintiff was helped out of the structure.

¶ 16    On cross-examination, plaintiff was questioned regarding an employee-injury report dated September 19, 2006, when he worked as a part-time firefighter for the District. According to the report, plaintiff was participating in rapid-intervention-team (RIT) training when he became overheated. Plaintiff explained at the hearing that, if a firefighter needs assistance or is "downed," the RIT team goes in to assist and/or remove the firefighter. Plaintiff agreed that this training exercise was similar to those in 2014 and 2015 during which he experienced difficulties. The report stated that, while plaintiff was in the process of removing a training mannequin from the structure, he "slumped over in an attempt to control his breathing. [Plaintiff] stated he was unable to continue with the scenario. [Plaintiff] was removed from the structure and evaluated by medical personnel." Plaintiff testified that he could not recall this incident, but he stated that there was no reason to believe that the report was inaccurate. According to the ambulance report related to this incident, plaintiff informed medical personnel that he felt lightheaded and had muscle cramping but that his symptoms were relieved after he exited the facility and drank some water. The report stated that plaintiff's vital signs were all normal and that plaintiff "refused any further assessment, treatment, or transport." He testified that he did not know if he shared this incident with any of the evaluating medical personnel in this case.

¶ 17    Plaintiff also testified to a "new recruit" evaluation he received in April 2010, which was shortly after he was hired by the District as a full-time firefighter/paramedic. The evaluation was conducted in a "burn tower," wherein various parameters were measured, including hose line management, SCBA skills, communication skills, and search-and-rescue skills. In pertinent part, the evaluation report stated that plaintiff "seems to still be uncomfortable in an SCBA while working in an IDLH atmosphere. He begins to hyperventilate and show signs of anxiety." Plaintiff agreed that the evaluation was conducted under circumstances similar to those of the training exercises listed on his disability application.

¶ 18    Plaintiff was also questioned regarding Dr. Adrian's records. The records indicated that plaintiff was diagnosed with "depressive disorder" in October 2009 and morbid obesity in July 2013. Plaintiff testified that he could not recall being diagnosed with depressive disorder, although he acknowledged that he was prescribed antidepressant medication around 2009.

Plaintiff also testified that his weight was between 325 and 345 pounds around the time of the training incidents, which meant that he was approximately 100 pounds overweight. Plaintiff agreed that participating in fire training drills while morbidly obese, dressed in full firefighting gear weighing more than 50 pounds, and dragging a training mannequin weighing approximately 200 pounds could cause him to experience shortness of breath.

¶ 19                    Independent Medical Evaluations

¶ 20    In accordance with section 4-112 of the Pension Code (40 ILCS 5/4-112 (West 2014)), the Board selected three physicians to evaluate plaintiff. The Board chose Drs. Robert A. Reff, Geoffrey S. Shaw, and Stevan M. Weine—all of whom were licensed to practice medicine and certified in the field of psychiatry.

¶ 21                            *Dr. Shaw's Report*

¶ 22    Dr. Shaw evaluated plaintiff on June 21, 2016, and submitted his initial report on July 1, 2016. He concluded that "[plaintiff's] symptoms are consistent with an Anxiety Disorder which is episodic and due to the occurrence of Anxiety/Panic symptoms occurring in certain situations." Plaintiff was therefore disabled "due to anxiety/panic symptoms occurring during the course of training (or presumably real life situations)," which would be "likely to [re]occur when placed in these stressful situations; especially when in [an] SCBA situation."

¶ 23    The Board asked Dr. Shaw to opine as to whether "the occurrences in question cause[d] and/or aggravate[d] any pre-existing condition, so as to result in a disability." Dr. Shaw responded as follows:

> "[Plaintiff] describes three occurrences.[1] In July 2014[,] he had the distressing situation of responding to an emergency that pertained to his son.[2] Understandably[,] he was distressed and subsequently when reminded of the situation; by responding to other pediatric calls; he would recall his feelings of anxiety[,] but there is no evidence that this occurrence prevented him from performing his duties as a Firefighter/ Paramedic. In October 2014[,] he was distressed by breathing difficulties to the degree that he was unable to complete a training exercise and required evaluation at a local E.R. In March 2015[,] he was perceived by others to be experiencing difficulties and this also resulted in an E.R. visit. There is no evidence that these occurrences were different or atypical from the training exercises that a Firefighter encounters during training and they did not directly cause his disability to perform his duties. Similarly[,] there is no evidence that his difficulties during these training exercises were due to the distressing call that he encountered in July 2014. Of note[,] upon review of The Evaluation 11 of New Recruits document[,] reference is made to his apparent difficulty in performing his duties. In particular[,] it states 'recruit McCumber seems to still be uncomfortable in an SCBA while working in an IDLH atmosphere. He begins to

---

[1]Dr. Shaw's report does not indicate whether plaintiff specifically discussed with him the May 21, 2015, training incident. Nevertheless, Dr. Shaw was apparently aware of this incident, as his report states that he reviewed plaintiff's employee-injury report for that date, in addition to the injury reports from October 29, 2014, and March 19, 2015.

[2]Plaintiff did not include this event on his application for disability benefits, and he makes no mention of it in his briefs on appeal.

hyperventilate and show signs of anxiety.' And 'recruit McCumber's search and rescue skills still need some work. Compared to his last evaluation[,] they have improved slightly. I believe this deficient skill is directly related to him not being comfortable in an SCBA.'

These statements indicate that he has had a history of difficulty (hyperventilation and anxiety) in [an] SCBA situation. These difficulties are not due to any work-related occurrences but rather his discomfort in certain stressful situations. This distress is due to an underlying pre-existing predisposition to anxiety in such situations and is not directly cause[d] by circumstances other than those that are typical for that profession. It is my opinion that his failure to perform these duties render him disabled but are not directly caused by the duties themselves."

¶ 24 The Board also asked Dr. Shaw whether "the occurrences in question merely demonstrate that when [plaintiff] is engaged in such activity and wearing his required equipment, he may become symptomatic as a result of any pre-existing/employment condition." Dr. Shaw answered as follows: "Yes. His symptoms occurred during specific situations (wearing required equipment during stressful situations) and are a result of his underlying pre-existing discomfort with these situations."

¶ 25 Dr. Shaw was also asked to opine as to "the likely cause and/or causes of [plaintiff's] condition." Dr. Shaw replied as follows: "[Plaintiff] is disabled due to anxiety symptoms occurring due to an underlying difficulties [*sic*] performing in specific situations. These anxieties were identified as early as 2010 and are due to pre-existing predispositions to become anxious in certain given situations."

¶ 26 Dr. Shaw agreed that plaintiff's symptoms resolved and he returned to his preexisting baseline once he was distanced from the stressful training exercises.

¶ 27 The Board subsequently asked Dr. Shaw to clarify his opinion as to the nature of plaintiff's disability and whether "plaintiff's psychological condition or conditions resulted from an act or acts of duty." Dr. Shaw issued an addendum on August 26, 2016, stating that his prior report was still his opinion, but that he drafted the addendum in order to provide clarification. Dr. Shaw stated as follows:

"[Plaintiff's] predisposition to severe anxiety (panic attacks) in specific situations was present during his early days of training[,] and this predisposition predates his employment as a firefighter/paramedic. The anxiety results from a physiological reaction to situations in which the person perceives that their breathing and survival is at risk. It was not caused by his duties as a firefighter, but rather, occurred as a result of his anxiety predisposition[,] which is unrelated to his occupation. Due to this anxiety, manifested during training exercises, he lacks the capacity to perform his job, but this lack of capacity did not occur due to his job. *** This condition (Anxiety Disorder NOS) was not caused by his job, but became evident during certain specific duties which are necessary in order to perform his job."

¶ 28 *Dr. Reff's Report*

¶ 29 Dr. Reff evaluated plaintiff on June 15, 2016. He submitted his initial report on June 23, 2016, and an addendum to the report on August 23, 2016. Dr. Reff concluded that plaintiff was disabled in that he was unable to "fully participate in live fire training exercises," which was an

- 6 -

"essential feature of being a firefighter/paramedic." He opined that plaintiff's disability was likely permanent, noting that he was unable to function in such training exercises even as a new recruit and that those difficulties "continued to intermittently manifest *** until May 2015." Dr. Reff also observed that, "once removed from the event and his equipment is doffed, [plaintiff] returns to baseline."

¶ 30    The Board asked Dr. Reff whether the training events listed on plaintiff's application for benefits "cause[d] his disability and/or aggravate[d] any pre-existing condition, so as to result in a disability." Dr. Reff answered as follows:

"In spite of [plaintiff's] statement to the contrary, March 19, 2015[,] was not the first such episode that was documented in the records. Neither was October 29, 2014. Based on the records reviewed, the first such occurrence took place while in a training session on September 19, 2009.[3] It is my opinion that the occurrences noted above represent an aggravation of his pre-existing specific anxiety related to wearing SCBA in training exercises. It is also my opinion that [plaintiff] is suffering from a multitude of psychosocial stressors that are not specifically related to his duties as a firefighter/paramedic, but which clearly contributed to his difficulty functioning as a firefighter/paramedic."

In his addendum, Dr. Reff clarified his answer as follows:

"It was my opinion that [plaintiff] first demonstrated anxiety while wearing required equipment (SCBA) in a training exercise on September 19, 2009 [*sic*]. Additional records provided would also support continuation of anxiety while wearing required equipment during an evaluation at a training site during April 2010. His anxiety appears to have been manifest specifically during training exercises and not during actual firefighting. [Plaintiff] was also suffering from a number of psychosocial stressors that contributed to his difficulty functioning as a paramedic/firefighter, but were not specific to his duties as a paramedic/firefighter. Therefore, it is my opinion that the dates in question (October 29, 2014, March 19, 2015, and May 21, 2015) aggravated his pre-existing condition (*i.e.* the specific anxiety pertaining to wearing SCBA gear) and did not cause his disability."

¶ 31    Dr. Reff was asked whether "the occurrences in question merely demonstrate[d] that when [plaintiff] is engaged in such activity and wearing his required equipment, he may become symptomatic as a result of any pre-existing/employment condition." Dr. Reff, in his initial report, answered as follows:

"There does not appear to be anything in the records or provided in [the] history by [plaintiff] to suggest that he experienced difficulty fighting fires in the field while wearing his required equipment. Based on the records reviewed, as well as [plaintiff's] statements, he only became symptomatic while engaged in training exercises. Ms. [Sarah A. Gura, MA, LCPC (plaintiff's clinical counselor),] has given her opinion as to the possible psychological etiology of this. Nevertheless, these training exercises are specific to [plaintiff's] employment as a firefighter/paramedic. As such, it is my opinion that the occurrences in question do demonstrate that while engaged in this

---

[3]The year "2009" appears to be a typographical error, as the employee-injury report referenced by Dr. Reff bears a date of September 19, 2006.

activity and wearing his required equipment, he has become symptomatic as a result of this employment condition."

On this issue, Dr. Reff stated in his addendum as follows:

"It was my opinion that [plaintiff] became symptomatic of anxiety while wearing SCBA and engaged in training exercises. As these training exercises are specific to his employment as a firefighter/paramedic, it is my opinion that he became symptomatic as a consequence of an employment condition. Additionally, his symptoms, which appear to occur only during these training exercises, have been noted since he was a recruit. Therefore, it would appear that he became symptomatic as a consequence of a pre-existing/employment condition. There is apparently no evidence that would support his inability to function during live fire calls."

¶ 32 Dr. Reff further stated his opinion as to "the likely cause and/or causes of [plaintiff's] condition." He stated:

"It is my opinion that [plaintiff] has an exaggerated psychological response to the specific environment of the training facility during live fire training exercises. This has happened in more than one location. It is likely that his response is a consequence of a multitude of factors, including the actual environment where the exercise is taking place as well as whatever might be a psychological trigger(s) for him during these exercises. It appears that he became more sensitive to this response as the severity of stressors in his life (*i.e.* fears for the loss of his job, the health of his son, financial concerns, [and] conflict within his marriage) became greater. I am unable to provide any opinion, aside from what Ms. Gura has previously suggested, as to why these exercises cause him to have such psychological distress. I can only opine that his distress is likely based on a response to some psychological phenomenon that is being stimulated during the course of the exercise."

In his addendum, Dr. Reff clarified this answer as follows:

"It was my opinion that[,] as a consequence of external environmental stressors, his pre-existing anxiety, which manifested during live fire training exercises, became aggravated. As the severity of external (*i.e.* non-line of duty) stressors increased, it was my opinion that his response to the training exercises got more exaggerated and he became more symptomatic.

* * *

It was my opinion that [plaintiff] suffers from a pre-existing anxiety disorder that is not specific to his line of work as a firefighter/paramedic. It is my opinion that [plaintiff's] external stressors aggravated his pre-existing anxiety disorder. It is my opinion that as the external stressors in his life became more severe, his pre-existing anxiety disorder became more pronounced. It is my opinion [that] as a consequence of the aggravation of his pre-existing anxiety disorder, he was unable to complete live fire training exercises and was, therefore, unable to fully function as a firefighter/ paramedic. While disabled, I believe that this represents a Non-Line of Duty Disability."

¶ 33 Dr. Reff expressed concern that plaintiff's self-described medical history was, at times, not consistent with his medical records. Dr. Reff observed that plaintiff "seemed to attempt to minimize any suggestion of pre-existing problems *** [and] denied any pre-existing

psychiatric problems," notwithstanding a diagnosis of depressive disorder in October 2009 and having been prescribed antidepressant medication. Plaintiff also "appeared to minimize the significance of what was going on in his life and how this could potentially contribute to his problems at work." Dr. Reff also referenced Gura's notes detailing plaintiff's conflicts with his coworkers and the significance of the stressors he was experiencing in his personal life.

¶ 34                               *Dr. Weine's Report*

¶ 35    Dr. Weine evaluated plaintiff on June 28, 2016, and submitted reports on July 18, 2016, and August 21, 2016. Dr. Weine concluded that plaintiff was not disabled from performing his duties as a firefighter because Dr. Weine found "no evidence of a current psychiatric diagnosis or disability." Dr. Weine opined that plaintiff "does not meet diagnostic criteria for any psychiatric disorder or disability which could explain his inability to pass the required firefighter training." In rejecting the possibility of a psychiatric disorder as the cause of plaintiff's difficulties, Dr. Weine opined that it was "far more plausible that this is related to [plaintiff's] morbid obesity and lack of adequate physical conditioning." Dr. Weine also noted that plaintiff returned to his "same pre-existing baseline" after each of the training exercises.

¶ 36              Additional Medical Evidence Considered by the Board
¶ 37                          *"Fitness for Duty" Evaluation*

¶ 38    Dr. Williamson-Link issued a report concerning plaintiff's "fitness for duty" on April 3, 2015. Dr. Williamson-Link indicated that he could not clear plaintiff for SCBA use "without knowing the exact etiology of why he is unable to wear a mask." Dr. Williamson-Link noted that he was unsure whether plaintiff's difficulty during the training exercises was caused by "a medical issue or [a] psychological issue," but he stated that the "actual etiology of this" was beyond the scope of his role as the District's occupational physician. He recommended that plaintiff "start at square one" and consult with his primary-care physician, a cardiologist, and a pulmonologist in order to determine the cause. In a June 24, 2015, letter to plaintiff's supervisor, Dr. Williamson-Link stated that plaintiff "is not fit for full duty at this time as a firefighter-paramedic" because plaintiff "cannot be cleared to wear SCBA, which is an intrical [*sic*] part of his essential job functions as a firefighter." Dr. Williamson-Link reiterated that he advised plaintiff to consult his treating physician and specialists for further evaluation.

¶ 39                              *Gura's Evaluation*

¶ 40    Gura's notes and records were also entered into evidence and considered by the Board. Her intake notes, dated March 26, 2015, detail a number of plaintiff's preexisting external stresses related to his family life, marriage, and financial circumstances. Gura indicated that she could not form an opinion as to whether plaintiff was "fit for duty" without having an opportunity to observe him in an environment similar to those that caused him difficulty during the training exercises. Gura attempted to schedule such a training exercise for observation but was unsuccessful. She lamented that "coordinating it with a willing [fire] department [was] near-impossible."

¶ 41    In a treatment plan dated June 29, 2015, Gura offered a number of diagnoses, including generalized anxiety disorder, specified anxiety disorder, "limited symptom (and/or panic) attacks specific to SCBA/breathing while in dangerous training conditions," and "occupational

problem *** (*i.e.* SCBA/breathing while in dangerous training conditions)." Based on her therapy with plaintiff, Gura concluded that the SCBA was not the source of plaintiff's anxiety but, rather, that it was "the type of structure that the drills are practiced in," colloquially known as "cans." Gura believed that plaintiff had a subconscious phobia of training in the "cans" and that, "after a long career of [plaintiff] ignoring this somewhat, once-subtle fear, and at a quite strenuous and turbulent time in his marriage/family situation ***, his brain definitely wouldn't tolerate this (level of stress/distress) anymore. [I]t all accumulated. We all have our limits; and this is why the symptoms hit their peak."

¶ 42                                   The Board's Decision
¶ 43        The Board issued a written decision on December 30, 2016, denying plaintiff's application for a line-of-duty disability pension under section 4-110 of the Pension Code. The Board found that plaintiff's psychological issues, which manifested during the fire training exercises, rendered him disabled from performing full-service duties for the District. However, the Board found that plaintiff failed to meet his burden of proof that the training exercises either caused or contributed to his disability. In finding no causation, the Board highlighted portions of each of the reports prepared by the independent evaluating physicians, which it stated amounted to a "plethora of evidence *** that neither the events in question nor any other 'act or acts of duty' served as a cause in preventing [plaintiff] from performing full service for the [District]." On administrative review, the circuit court affirmed the Board's decision. Plaintiff timely appealed.

¶ 44                                        ANALYSIS
¶ 45        Under section 3-148 of the Pension Code (40 ILCS 5/3-148 (West 2014)), judicial review of a decision made by a pension board is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)). In an administrative review case, our role is to review the decision of the administrative agency, not the determination of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). On administrative review, it is not our function to reweigh the evidence or make an independent determination of the facts. *Board of Education of Round Lake Area Schools v. State Board of Education*, 292 Ill. App. 3d 101, 109 (1997). "The findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2016).

¶ 46                                    Standard of Review
¶ 47        The standard of review to be applied depends on whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 40. Plaintiff argues that the "clearly erroneous" standard should apply to our review of the Board's decision because the question of whether he met his burden of proof is a mixed question of fact and law. We disagree. This appeal concerns whether plaintiff's employment as a firefighter was, at the very least, a causative factor that contributed to his anxiety disorder—this is a question of fact, and no issue of law is entwined in it. Indeed, the question of whether an act of duty caused or contributed to a disability under the Pension Code has been routinely found to be a question of fact. *Id.* ¶ 42.

¶ 48    We must defer to the Board on questions of fact unless its findings are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 21. If evidence contained in the administrative record supports the Board's factual conclusions, we may not disrupt those conclusions, even if the opposite conclusion is reasonable. *Id.* There need be only some competent evidence in the record to support the Board's findings. *Hahn v. Police Pension Fund*, 138 Ill. App. 3d 206, 209 (1985). We note, however, that even under the manifest-weight-of-the-evidence standard, the deference afforded to the decision of the administrative agency is not boundless (*Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007)), and a reviewing court should not hesitate to grant relief where the administrative record does not show evidentiary support for the agency's determination (*Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 210-12 (2006)).

¶ 49                                Causative Factor

¶ 50    In order to be entitled to a line-of-duty disability pension, a firefighter must establish that he or she is physically or mentally permanently disabled "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty." 40 ILCS 5/4-110 (West 2014). An act of duty is defined as "[a]ny act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2014). The plaintiff in an administrative proceeding bears the burden of proof, and relief will be denied if that burden is not met. *Marconi*, 225 Ill. 2d at 532-33.

¶ 51    Plaintiff's primary argument on appeal is that the Board improperly focused on whether the training exercises were the primary cause of his anxiety disorder and failed to consider whether the exercises were a "causative factor" that contributed to his disability. As such, he contends that the Board failed to apply the correct legal standard in evaluating causation. Plaintiff argues that the Board ignored portions of the reports prepared by Drs. Shaw and Reff, who both, according to plaintiff, "opined the work-related activities aggravated an underlying anxiety disorder causing it to become symptomatic." Plaintiff draws our attention to certain statements in Dr. Reff's report, wherein he indicated that the training exercises "represent an aggravation of his pre-existing specific anxiety related to wearing SCBA in training exercises" and "demonstrate that while engaged in this activity and wearing his required equipment, [plaintiff] has become symptomatic as a result of this employment condition." He also highlights Dr. Shaw's opinion that "[t]his condition (Anxiety Disorder NOS) was not caused by [plaintiff's] job, but became evident during certain specific duties which are necessary in order to perform his job."

¶ 52    It is well settled that "[a] claimant need not prove that a duty-related accident is the sole cause, or even the primary cause, of his disability" in order to obtain a line-of-duty disability pension, "although a sufficient nexus between the injury and the performance of the duty must exist." (Internal quotation marks omitted.) *Carrillo*, 2014 IL App (1st) 130656, ¶ 23. Indeed, a disability can have multiple causes. *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543, 550 (2002). The claimant need prove only "that the duty-related accident is a causative factor contributing to the claimant's disability." *Id.* In other

- 11 -

words, the claimant must establish a causal connection between his or her disability and an act of duty. *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d 486, 489 (1993). A line-of-duty disability pension may be based upon the duty-related aggravation of a claimant's preexisting condition. *Id.*; see also *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 371 (2005); *Scalise v. Board of Trustees of the Westchester Firemen's Pension Fund*, 264 Ill. App. 3d 1029, 1033 (1993). "[E]ven though an employee has a preexisting condition which may make him more vulnerable to injury, recovery for an accidental injury will not be denied as long as it can be shown that the employment was also a causative factor." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003).

¶ 53    At the outset, we observe that plaintiff suggests that the Board failed to acknowledge, or perhaps was simply unaware, that, in order to establish entitlement to a line-of-duty disability pension, he was not required to prove that a duty-related injury was the primary cause of his anxiety disorder. We reject this argument, as it is belied by the Board's 35-page written decision. Therein, it expressly and repeatedly acknowledged that an act of duty need not be the sole or primary cause of the disability but, rather, that a duty-related aggravation of a preexisting condition would suffice.

¶ 54    We also reject plaintiff's characterization of the reports prepared by Drs. Shaw and Reff, as neither opined that the training exercises in question caused or exacerbated plaintiff's underlying anxiety disorder. In particular, Dr. Shaw opined that plaintiff's difficulties during the training exercises were "not due to any work-related occurrences" but were attributable to "an underlying pre-existing predisposition to anxiety in such situations." Dr. Shaw explicitly relied on plaintiff's documented "history of difficulty (hyperventilation and anxiety) in [an] SCBA situation." Of note, Dr. Shaw quoted portions of plaintiff's April 2010 evaluation stating that he began to "hyperventilate and show signs of anxiety" while wearing a SCBA in a dangerous training environment. Dr. Shaw reiterated that plaintiff's predisposition to severe anxiety "was present during his early days of training *** and predates his employment as a firefighter/paramedic." Dr. Shaw also indicated that this predisposition "manifested" and "became evident" during the training exercises but "was not caused by his job." Also, he stated unambiguously that plaintiff's anxiety disorder "was not caused by his duties as a firefighter, but rather, occurred as a result of his anxiety predisposition which is unrelated to his occupation."

¶ 55    Although the Board quoted portions of Dr. Shaw's report indicating that plaintiff's disability was not "directly" caused by his employment as a firefighter, it also highlighted segments of the report that effectively refute the idea that plaintiff's preexisting anxiety disorder was caused or exacerbated by the training exercises. Indeed, Dr. Shaw noted that plaintiff's symptoms resolved and he returned to the preexisting baseline once he was removed from the training exercises.

¶ 56    Dr. Reff reached conclusions similar to those of Dr. Shaw. Dr. Reff concluded that plaintiff's anxiety during the three training exercises was due to his "pre-existing specific anxiety related to wearing SCBA in training exercises" and that the training exercises "did not cause [plaintiff's] disability." Dr. Reff noted that plaintiff's difficulties with anxiety were identified when plaintiff was a new recruit—long before the three training exercises. Dr. Reff opined that plaintiff suffers "from a multitude of psychosocial stressors that are not specifically

- 12 -

related to his duties as a firefighter/paramedic, but which clearly contributed to his difficulty functioning as a firefighter/paramedic."

¶ 57   Plaintiff stresses Dr. Reff's opinion that the training exercises "represent an aggravation of his pre-existing specific anxiety" and "demonstrate that while engaged in this activity and wearing his required equipment, [plaintiff] has become symptomatic." Tellingly, plaintiff quotes these statements in relative isolation. When read in the context of the entire report, these statements do not suggest that Dr. Reff concluded that the training exercises caused or exacerbated plaintiff's anxiety disorder. Importantly, Dr. Reff opined that, "once removed from the event and his equipment is doffed, [plaintiff] returns to baseline." Dr. Reff also made clear his opinion that, although the training exercises "aggravated [plaintiff's] pre-existing condition (*i.e.* the specific anxiety pertaining to wearing SCBA)," they "did not cause his disability." Dr. Reff stated that plaintiff "became symptomatic of anxiety while wearing [an] SCBA and engaged in training exercises" and that this "anxiety appears to have been manifest specifically during [the] training exercises."

¶ 58   Taken as a whole, Dr. Reff's report reflects his opinion that the training exercises in question did not cause or exacerbate plaintiff's condition but triggered symptoms of his preexisting anxiety disorder. In other words, the anxiety symptoms plaintiff experienced were merely the manifestation of his underlying preexisting condition. We note that this conclusion is similar to that of Dr. Shaw, who opined that plaintiff's anxiety disorder "manifested during [the] training exercises" and "became evident" but that the disorder "was not caused by his job." In this respect, both doctors took care to differentiate between the preexisting condition itself and the manifestation of the condition in the form of symptoms.

¶ 59   Dr. Reff also noted that plaintiff became more sensitive to his exaggerated psychological response "as the severity of stressors in his life (*i.e.* fears for the loss of his job, the health of his son, financial concerns, [and] conflict within his marriage) became greater." Although Dr. Reff could not opine as to why the training exercises triggered plaintiff's anxiety and/or panic attacks, he stated that they were "likely based on a response to some psychological phenomenon that is being stimulated during the course of the exercise." Dr. Reff made clear his opinion that, although plaintiff was disabled, "this represents a non-line of duty disability."

¶ 60   Though only briefly discussed in plaintiff's brief, we would be remiss if we did not reiterate Dr. Weine's conclusion that plaintiff was not disabled from performing his duties as a firefighter, as Dr. Weine found "no evidence of a current psychiatric diagnosis or disability." Rather, Dr. Weine opined that it was "far more plausible that this is related to [plaintiff's] morbid obesity and lack of adequate physical conditioning." Like Drs. Shaw and Reff, Dr. Weine also noted that plaintiff returned to the "same pre-existing baseline" after each of the training exercises.

¶ 61   Explicitly based on the medical reports and other evidence, the Board concluded that none of the three evaluating physicians opined that plaintiff's inability to perform full-service duties for the District was either caused or exacerbated by the training exercises listed on plaintiff's application for disability benefits, and it therefore denied plaintiff's request for a line-of-duty disability pension. After reviewing the administrative record in this case, we cannot say that this determination is against the manifest weight of the evidence, as the record contains ample competent evidence in support thereof, as outlined above.

¶ 63      Plaintiff next argues that the Board deprived him of his due process right to a fair hearing in two ways. First, he contends that the Board was confused as to the nature of plaintiff's disability, in that it improperly relied on "an alleged condition of depressive disorder as the basis for plaintiff having a pre-existing condition of anxiety disorder." Second, plaintiff maintains that the Board improperly influenced the evaluating physicians when it suggested that a line-of-duty disability pension is not appropriate if plaintiff was not mentally equipped to perform services as a firefighter due to an unknown cause. Plaintiff highlights the following paragraph in correspondence from the Board's counsel to Dr. Weine: "I would assume some individuals are neither mentally nor physically equipped to perform services required by either fire or police. Does the same necessarily suggest that an individual is *disabled* (psychological) merely because they do not have the physical or mental capacity to perform this type of employment (firefighter)?" (Emphasis in original.)

¶ 64      The requirements of due process apply to administrative proceedings, which must be conducted by a fair and impartial tribunal. *Buckner v. University Park Police Pension Fund*, 2013 IL App (3d) 120231, ¶ 21. Whether the due process rights of a pension applicant were violated is a question of law, which we review *de novo*. *Id.*

¶ 65      We determine that no due process violation occurred. Although the Board, at times, included depression among the symptoms it stated plaintiff experienced during the three training exercises listed on plaintiff's application, there is simply no indication that it "relied" on this condition or that it was "confused" regarding the nature of plaintiff's disability. Indeed, the medical reports relied on and quoted at length in the Board's written decision make clear that it understood the nature of plaintiff's disability as alleged in his application for benefits. In particular, the Board's findings accurately state the symptoms plaintiff testified he experienced during each of the three training exercises, and they also referenced plaintiff's difficulties during his "new recruit" evaluation in April 2010, when "he experienced issues of hyperventilation, shortness of breath and signs of anxiety, similar to those symptoms he experienced during the events in question, which form the basis of [plaintiff's] application." Put simply, the Board's written decision, as a whole, leaves no doubt that it understood the nature of plaintiff's disability as alleged in his application.

¶ 66      We similarly determine that no due process violation occurred when the Board asked the evaluating physicians for clarification of their medical opinions. We do not find that the Board suggested an improper legal standard on the issue of causation, and we therefore reject plaintiff's assertion that the Board failed to remain fair and impartial. Further, we note that each physician was asked whether "the occurrences in question (October 29, 2014; March 19, 2015; and May 21, 2015) cause[d] [plaintiff's] disability and/or aggravate[d] any pre-existing condition so as to result in a disability." This question was proper and refutes the idea that the physicians were improperly influenced.

¶ 67                                CONCLUSION

¶ 68      For the foregoing reasons, we determine that the Board's decision to deny plaintiff a line-of-duty disability pension is not against the manifest weight of the evidence. Accordingly, the judgment of the circuit court of Kendall County is hereby affirmed.

¶ 69      Affirmed.