2026 IL App (1st) 231447-U

No. 1-23-1447

Order filed May 21, 2026

FOURTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| STEPHEN P. HULL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CH 02756 |
| | ) | |
| THE VILLAGE OF WHEELING POLICE PENSION | ) | |
| FUND, THE BOARD OF TRUSTEES OF THE | ) | |
| VILLAGE OF WHEELING POLICE PENSION FUND, | ) | |
| and THE VILLAGE OF WHEELING, | ) | Honorable |
| | ) | Joel Chupack, |
| Defendants-Appellees. | ) | Judge presiding. |

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The police pension board's decision granting Mr. Hull a non-duty disability pension rather than a line-of-duty disability pension is affirmed where its determination that Mr. Hull's major depressive disorder was not incurred in, or a result from, performing an act of duty was not against the manifest weight of the evidence.

¶ 2    On or about April 5, 2018, plaintiff-appellant, Stephen Hull, filed an application for

disability pension benefits with defendant-appellee, the Board of Trustees of the Village of

Wheeling Police Pension Fund (Pension Board). On January 8, 2019, defendant-appellee, the Village of Wheeling (Village), filed a petition to intervene. The Pension Board found that Mr. Hull was not disabled based on a neurological condition but was disabled due to a major depressive disorder (MDD). The Pension Board concluded, however, that Mr. Hull's MDD did not occur while, or as a result from, performing an act of duty; specifically, a motor vehicle accident that occurred while he was on duty. Accordingly, the Pension Board denied Mr. Hull's application for a line-of-duty disability pension and, instead, awarded him a non-duty disability pension based on his MDD.

¶ 3      On appeal, Mr. Hull contends that the Pension Board's denial of a line-of-duty disability pension based on his MDD was against the manifest weight of the evidence because its decision relied solely on the "erroneous, contradictory, and unsupported opinions" of Dr. Stephen Dinwiddie and disregarded the opinions of other psychiatrists and physicians. Alternatively, Mr. Hull argues that he is entitled to a line-of-duty disability pension because the motor vehicle accident was a contributing cause to his development of MDD and resulting disability and, thus, the Pension Board's determination was clearly erroneous. For the following reasons, we affirm the judgment of the circuit Court of Cook County.

¶ 4                                    BACKGROUND

¶ 5      Mr. Hull began his employment as a probationary police officer for the Village on July 5, 2016. On April 5, 2018, he applied to the Pension Board for a line-of-duty disability pension. On February 5, 2021, the Board held a hearing on his application where it heard testimony from Mr. Hull, his wife, Nicole Hull, and the Wheeling Police Department Chief, James Dunne. The Pension Board also received voluminous exhibits and documents that were admitted into evidence. As the

hearing began, Mr. Hull asked the Pension Board to alternatively consider granting him a non-duty disability pension without prejudice to his claim for a line-of-duty pension.

¶ 6    At the hearing, Mr. Hull testified that on September 24, 2017, he was involved in a motor vehicle accident while driving his police vehicle on patrol. The driver's door was struck during the accident. He was extricated by emergency personnel and transported to a hospital. He sustained a large bump with bruising on his left temple and forehead. He also sustained injuries to his back, leg, and feet.

¶ 7    Mr. Hull testified that he had only faint recollection of the accident and his first moment of clarity occurred when he awoke in the hospital. He was admitted to the hospital for overnight observation and discharged the next day with instructions to follow up with a neurologist. A progress note in his hospital records stated that upon discharge, he was able to walk in the hall without difficulty and had no complaints of pain or dizziness. Mr. Hull testified, however, that following the accident, he suffered from day-long headaches and migraines, visual impairment, frequent dizziness, back pain, lack of coordination, and a weak left leg.

¶ 8    On September 28, 2017, Mr. Hull was evaluated by Dr. Ricardo Senno, a brain trauma specialist. He underwent an MRI or CT scan of his brain. Dr. Senno diagnosed Mr. Hull with a moderate-to-severe traumatic brain injury, vertigo, and headaches. Dr. Senno recommended that he not return to work at that time. Dr. Senno further recommended that Mr. Hull undergo a neuropsychological evaluation with a specialist and engage in counseling for some of his symptoms. However, the workers' compensation insurance carrier for the Village refused to authorize those treatments. Mr. Hull also saw Dr. Senno on October 26, 2017, December 5, 2017, and in March 2019.

¶ 9    On December 8, 2017, at the request of the workers' compensation insurance carrier, Mr. Hull was evaluated by neurosurgeon Dr. Harel Deutsch. Dr. Deutsch recommended he return to light duty work. In late December 2017, Mr. Hull worked four-hour shifts in the dispatch center, listened to 911 calls, and learned new standard operating procedures. Both Drs. Senno and Deutsch prohibited Mr. Hull from driving at that time. He testified that he requested an accommodation from the police department to assist him with transportation to and from work, but it was denied. Consequently, he drove to work against the doctors' orders.

¶ 10    Mr. Hull testified that he first began feeling "abandoned" and "worthless" in December 2017, after the authorization for the treatment recommended by Dr. Senno had been denied and after seeing Dr. Deutsch.

¶ 11    On December 29, 2017, while at work, Mr. Hull suffered a migraine with vertigo, nausea, and vision impairment. He lost coordination and could not walk or speak clearly. He was transported to the emergency room at Glenbrook Hospital. The doctors there found that he was experiencing issues with his vision including a positive lateral gaze nystagmus. After missing a week of work, Mr. Hull returned to light duty in January 2018 for three or four days. He was then advised by the police department to stay home until further notice because he was not supposed to be driving. Mr. Hull never returned to work for the Village.

¶ 12    On February 7 and 8, 2018, Mr. Hull underwent a neuropsychological evaluation with Dr. Leslie Guidotti-Breting, which was arranged by his attorneys. Dr. Senno had recommended the evaluation, but after the insurance carrier for the Village refused to authorize it, Mr. Hull paid for it himself. Dr. Guidotti-Breting diagnosed him with a mild traumatic brain injury with a concussion, adjustment disorder, mixed anxiety, and depressed mood. Dr. Guidotti-Breting

recommended that he undergo further testing with a neurologist, a psychiatric evaluation, and engage in counseling.

¶ 13    In an evidence deposition submitted by Mr. Hull, Dr. Guidotti-Breting testified that his adjustment disorder, mixed anxiety, and depressed mood were due to the motor vehicle accident on September 24, 2017. She explained that, based on her interview with Mr. Hull, there was no indication that he suffered from the symptoms to the extent he was currently experiencing prior to the accident.

¶ 14    Mr. Hull testified that he received no response from the Village's workers' compensation carrier regarding the treatments recommended by Dr. Guidotti-Breting. He texted Wheeling Police Department Chief Dunne and Wheeling Police Department Deputy Chief Todd Wolff to assist him with obtaining a response. Wheeling Police Department Chief Dunne advised Mr. Hull to follow the advice of his attorneys and doctors. Wheeling Police Department Chief Dunne and Wheeling Police Department Deputy Chief Wolff then told Mr. Hull that they were no longer allowed to communicate directly with him and that his attorney had to communicate with the attorney for the Village.

¶ 15    Mr. Hull testified that from March 2018 to August 2018, he continued suffering from headaches, migraines, vertigo, vision impairment, balance and coordination issues, nausea, and vomiting. Psychologically, he was frustrated with his inability to recover and return to his active lifestyle. He was told he could not speak with anyone at the police station about his situation, including Wheeling Police Department Chief Dunne and Wheeling Police Department Deputy Chief Wolff. He felt that he had been "abandoned," "casted out," and "isolated" by the people

whom he "swore [his] life to." He testified that he pleaded for help but was ignored. He felt "very lost," "empty and worthless."

¶ 16     On April 5, 2018, Mr. Hull applied for a line-of-duty disability pension under section 3-114.1 of the Illinois Pension Code (Pension Code) (40 ILCS 5/3-114.1 (West 2018)). He alleged he was disabled from performing his duties as a police officer due to the motor vehicle accident from September 24, 2017. He did not describe the nature of his disability, nor did he explain the physical or mental conditions that rendered him disabled. On May 7, 2018, the Pension Board requested that Mr. Hull identify the specific physical or mental condition that allegedly rendered him disabled.

¶ 17     Mr. Hull testified that in the spring of 2018, Dr. Guidotti-Breting and another unnamed counselor he was seeing recommended that he get out of the house and do something constructive, such as volunteering in an athletic environment, which was his passion. In the summer of 2018, he approached the head football coach at Cary-Grove High School and offered to volunteer with the student-athletes. He stressed to the coach that he was not seeking a paid position. Mr. Hull shared his knowledge and experience with the students, but did not engage in any physical activity. Later that summer, the head coach gave him a check from the school as a token of appreciation. He donated the money back to the school's football program. He testified that being involved with the football program helped him feel like he was part of a team again, even though there were days when he could not participate due to his symptoms.

¶ 18     On August 1, 2018, Mr. Hull was evaluated by Dr. Debbie Weiss, with whom he had scheduled an appointment through his HMO insurance. Dr. Weiss diagnosed him with post-

concussive syndrome and depression. She gave him some medications. After a third or fourth appointment, Dr. Weiss referred him to a neurologist, Dr. Sanford Sherman.

¶ 19    On August 24, 2018, Mr. Hull's public employee disability benefits ended. He testified that on August 30, 2018, Dr. Sherman diagnosed him with a concussion and "psychological issues." Dr. Sherman recommended he engage in counseling and vestibular therapy. He saw Dr. Sherman again on September 25, 2018, November 19, 2018, and February 27, 2019.

¶ 20    On September 24, 2018, Mr. Hull underwent a fitness-for-duty evaluation that was required by the police department. He was evaluated by two psychologists – Dr. Kyle Hunneke and Dr. Charles Milofsky. The psychologists diagnosed him with somatic symptom disorder, adjustment disorder with mixed anxiety, and depressed mood. Drs. Hunneke and Milofsky opined that he was not psychologically fit for duty.

¶ 21    Mr. Hull testified that Drs. Hunneke and Milofsky recommended he undergo a minimum of four weeks of psychiatric treatment and counseling, then be reevaluated for a possible return to light duty. The workers' compensation carrier did not approve the recommended treatment.

¶ 22    On October 1, 2018, Mr. Hull told Dr. Weiss that his mood had improved but that he had received bad news at work. He told Dr. Weiss that he recently underwent a fitness-for-duty exam and was afraid he was going to be terminated. Consequently, he had been feeling more depressed.

¶ 23    On October 3, 2018, through Dr. Sherman's referral, Mr. Hull began counseling with a licensed clinical professional counselor, Lorie Jendryka. He told Ms. Jendryka that he received no support from the police department and attributed his depressive symptoms to "[f]eelings of abandonment by the police department and feelings of not being worth the time or energy or money to invest in to get healthy." He acknowledged he was also under stress due to financial concerns

and the fact that he was not able to physically do things he used to do. He testified that he still saw Ms. Jendryka on a weekly basis. From October 9, 2018, through March 13, 2019, Mr. Hull underwent vestibular therapy. On October 29, 2018, through Ms. Jendryka's referral, he saw a psychiatrist, Dr. Jonathan Gamze.

¶ 24    Mr. Hull testified that on November 28, 2018, he went to the police station to meet with Wheeling Police Department Chief Dunne, presumably for the two of them to discuss his return to work. Instead, he was questioned by a human resources representative and an attorney for the Village to determine whether there was a reasonable accommodation that would allow him to return to work. Wheeling Police Department Chief Dunne and Wheeling Police Department Deputy Chief Wolff sat behind him during the meeting.

¶ 25    On December 26, 2018, Mr. Hull's counsel replied to the Pension Board's May 7 request to identify the condition that allegedly rendered him disabled. Mr. Hull stated that following the accident, he had been diagnosed with a mild traumatic brain injury, a concussion with resulting post-concussive syndrome, and vestibular dysfunction causing nausea, dizziness, and photophobia. He further stated that he had also been diagnosed with "anxiety disorder and depression resulting from the on-going physical symptoms caused by the accident."

¶ 26    On January 16, 2019, Wheeling Police Department Chief Dunne sent a letter to the Board of Fire and Police Commissioners recommending Mr. Hull be terminated from his position as a probationary police officer. Wheeling Police Department Chief Dunne provided two reasons for termination: (1) the police department was unable to determine when or whether Mr. Hull would ever return to work to complete his probationary period; and (2) Mr. Hull failed to notify the police department of his secondary employment with the Cary-Grove High School football team and

accepted money while earning workers' compensation and public employee disability (PEDA) benefits.

¶ 27     On January 25, 2019, the Board of Fire and Police Commissioners held a hearing after which Mr. Hull's employment was terminated. He acknowledged that he felt depressed after being terminated.

¶ 28     On March 12, 2019, Mr. Hull underwent another evaluation by Dr. Senno. He was not cleared to return to any type of work. Mr. Hull testified that he was still experiencing the same physical symptoms at that time including migraines, vertigo, and nausea. Psychologically, he felt "targeted and attacked" for trying to get healthy and having it turned against him. He stated that he felt he was in a "dark place of worthlessness."

¶ 29     In the Pension Board hearing, Mr. Hull testified that Ms. Jendryka took him to the hospital after he expressed suicidal ideations during one of their sessions. He testified that his feelings of worthlessness escalated following his termination. His wife was pregnant at the time, and he questioned how he could care for a child when he was unable to take care of himself. He was hospitalized for depression for one week and thereafter received outpatient treatment.

¶ 30     On April 16, 2019, the Pension Board granted the Village's petition to intervene in the proceeding.

¶ 31     Pursuant to section 3-115 of the Pension Code (40 ILCS 5/3-115 (West 2018)), the Pension Board scheduled Mr. Hull to be evaluated by three neurologists and three psychiatrists. The three neurologists were Dr. Jeffrey Kramer, Dr. Neil Allen, and Dr. Leslie Masood. The three psychiatrists were Dr. Brian McFaul, Dr. Robert Reff, and Dr. Stephen Dinwiddie.

¶ 32 In late 2019, Mr. Hull began working as a records clerk for the South Barrington Police Department. In his application for the job, dated November 20, 2019, he stated, "although I cannot *physically* serve and protect in the field, I am still mentally capable of contributing. I am able to handle any task that's presented to me, and focus on every detail that's required for the job to be completed promptly and appropriately." (Emphasis in original.) He testified at the hearing that there were several days when he had to leave work early or come in late due to his continuing headaches and symptoms. He left his employment with the South Barrington Police Department in December 2020.

¶ 33 Mr. Hull testified that at the time of the pension hearing, he still suffered from headaches and migraines. The other symptoms occurred less frequently. He also continued to struggle with feelings of abandonment and worthlessness. He was still seeing Ms. Jendryka and Dr. Gamze for his mental health treatment and was taking medications for depression and ADHD.

¶ 34 Mr. Hull's wife testified that she first noticed symptoms of depression in Mr. Hull towards the end of 2017. He became very withdrawn and "seemed down about everything." He suffered from constant headaches that developed into migraines, dizziness, vertigo, and nausea. Ms. Hull claimed that when workers' compensation refused to approve treatments recommended by Dr. Senno, the lack of care negatively affected Mr. Hull's mental health.

¶ 35 The Village presented testimony from Wheeling Police Department Chief Dunne. In the fall of 2018, Wheeling Police Department Chief Dunne learned Mr. Hull was employed as a football coach at Cary-Grove High School while receiving PEDA benefits. At the November 29, 2018, meeting, Mr. Hull was asked if there were any accommodations the Village could make that would allow him to work in a position in the Village. Wheeling Police Department Chief Dunne

testified that Mr. Hull was adamant that he could not work in any position with the Village or the Wheeling Police Department. Thereafter, Wheeling Police Department Chief Dunne filed the letter with the Board of Police and Fire Commissioners requesting Mr. Hull's termination.

¶ 36 Wheeling Police Department Chief Dunne further testified that in early 2020, he learned Mr. Hull was working for the South Barrington Police Department, which raised questions regarding Mr. Hull's credibility. Wheeling Police Department Chief Dunne was also troubled by the fact that Mr. Hull hired a personal injury attorney very soon after the accident. Wheeling Police Department Chief Dunne stated that Mr. Hull failed to follow his doctors' advice while claiming the Village was being uncooperative with approving treatment, then accepted a job with another police department after rejecting a similar light-duty assignment in the Village. Wheeling Police Department Chief Dunne believed Mr. Hull was being "deceitful and dishonest" with him.

¶ 37 Included with the Village's numerous exhibits were the independent medical examination reports completed by the three neurologists and three psychiatrists. Two of the neurologists, Drs. Allen and Masood, separately opined that Mr. Hull was not disabled due to a neurological condition. Dr. Allen stated that Mr. Hull's reports of continuous headaches and dizziness were inconsistent with a diagnosis of post-concussive syndrome as such symptoms should have resolved within six months of the injury. Dr. Allen further stated that Mr. Hull's perception of nausea, dizziness, and photophobia were subjective symptoms that could not be documented during a physical examination by a neurologist. Dr. Allen stated that his examination of Mr. Hull showed "many symptoms of magnification," including intermittent eye closure and aversion of gaze, and sensory symptoms that were inconsistent with the physiologic basis. Dr. Allen concluded that, based on his neurological findings, Mr. Hull could return to "full capacity as a police officer."

¶ 38    Similarly, Dr. Masood stated that any symptoms related to a mild concussion from the accident would have resolved within a few days to a few weeks. Dr. Masood stated that Mr. Hull may have a chronic migraine headache disorder, but such condition is hereditary and cannot be caused by a motor vehicle accident. Dr. Masood further stated that the headaches could be alleviated by medication and would not prevent Mr. Hull from performing his full duties as a police officer.

¶ 39    The third neurologist, Dr. Kramer, opined that Mr. Hull was disabled due to dizziness which prevented him from running and engaging in exertional activities required of a police officer. Dr. Kramer found that the dizziness resulted from Mr. Hull's traumatic brain injury and post-concussive syndrome which was caused by the accident. Dr. Kramer further opined that he was not disabled due to headaches. Dr. Kramer also noted "some exaggerated eye movement findings" during his examination of him.

¶ 40    All three psychiatrists independently concluded Mr. Hull was disabled due to MDD. Dr. McFaul opined that he suffered from MDD, posttraumatic stress disorder (PTSD), somatic symptom disorder, and atypical panic attacks in public settings. The PTSD was directly related to the trauma Mr. Hull suffered from the motor vehicle accident. Dr. McFaul reported that Mr. Hull first recalled feeling "somewhat hopeless" in August 2018. Mr. Hull became more hopeless in October 2018 after he received his "last paycheck." He expressed concern that his physical instability would make him unable to manage his child, which contributed to his sense of hopelessness and suicidal thinking. He was also worried that the police department was tracking him and recording him to catch him being more functional than he actually was.

¶ 41    Dr. McFaul stated that he concurred with the opinions of other medical professionals who found Mr. Hull's symptoms were not consistent with a traumatic brain injury. Dr. McFaul stated that Mr. Hull's experiences were consistent with purely psychiatric manifestations. He further stated that it was difficult to speculate on his likelihood of being able to return to full-time duty as a police officer as his improvements appeared "tepid" and he needed more aggressive medication management. Dr. McFaul opined that all the psychiatric conditions with which he diagnosed Mr. Hull were "directly related" to the motor vehicle accident of September 24, 2017. The questionnaire for the independent medical examination asked Dr. McFaul to provide an explanation for his opinion but he did not.

¶ 42    Dr. Reff opined that Mr. Hull was initially disabled due to the "physical sequelae" of the concussion he sustained from the motor vehicle accident on September 24, 2017, rather than MDD. Mr. Hull's depression was a consequence of that injury. Dr. Reff found that he began to feel estranged from his colleagues at work and confused over his lack of recovery and "the way he was being dealt with." Those feelings "led to an escalation of depression, suicidal wishes and plans and ultimately a psychiatric hospitalization." Dr. Reff further found that Mr. Hull was "recovering from an acute depressive episode" and once recovered, he would be capable of functioning and returning to full duty as a police officer.

¶ 43    Dr. Reff opined that the accident was not the proximate cause of Mr. Hull's disability but "contributed to it by setting in motion the cascade of events" that ultimately led to his depression. Dr. Reff explained, "but for the accident, he would not have been physically injured. But for the injury and his protracted recovery, he would not likely have volunteered to coach for the local high school football team as he would still have been working full duty. But for volunteering for the

football team, he would not likely have gotten terminated. But for having gotten terminated, he would not likely have gotten depressed. But for not having gotten depressed, he would likely not have become suicidal to the degree that he required psychiatric hospitalization."

¶ 44    Dr. Dinwiddie diagnosed Mr. Hull as having MDD, "single episode, in partial remission," with ongoing symptoms that were significant enough to prevent him from being able to perform the full and unrestricted duties of a police officer at that time. Dr. Dinwiddie found that the onset of his MDD was unclear. He noted that he reported significant depressive symptoms to his primary care physician on August 1, 2018, and was prescribed an antidepressant. He also reported significant depressive symptoms to his therapist on October 3, and 13, 2018. But on October 29, 2018, Dr. Gamze did not note any depressive symptoms. On December 5, 2018, Mr. Hull reported suicidal ideation to Ms. Jendryka with no action taken. But on January 16, 2019, Dr. Gamze specifically noted an absence of depressive symptoms. Dr. Dinwiddie noted that in the interim, Mr. Hull was terminated from the police department. Dr. Dinwiddie found that Mr. Hull's medical history, and his own account, showed his depressive symptoms substantially worsened around February of 2019. Prior to that time, based on the inconsistency of reported symptoms, Dr. Dinwiddie opined that Mr. Hull's depressive condition "would likely not have been disabling." (Emphasis in original.)

¶ 45    Dr. Dinwiddie specifically found that Mr. Hull's MDD was not caused by the motor vehicle accident on September 24, 2017. The doctor noted that psychological symptoms were not prominent when Mr. Hull sustained his concussion following the accident. He opined, "it appears that low mood and symptoms of Major Depressive Disorder manifested, at the earliest, nearly a year after the 9/24/2017 incident, thus making a causal connection unlikely." He further stated,

"[n]o causal relationship is identified." Rather, Dr. Dinwiddie opined that, to the extent stressors associated with the onset of Mr. Hull depressive episode could be identified, they appeared to be "related to the anticipation of, and later occurrence of, his job termination."

¶ 46     In addition, Dr. Dinwiddie found that Mr. Hull's depressive illness had substantially improved. He opined that with ongoing pharmacological and psychological therapies, Mr. Hull could reasonably be expected to return to duty as a police officer if he wished to do so.

¶ 47     In addition to the independent medical examination reports, the Village also submitted an evidence deposition from Dr. Dinwiddie. Therein, Dr. Dinwiddie acknowledged that the medical records showed that Mr. Hull had demonstrated many symptoms of depression including increased irritability, loss of interest or pleasure, social withdrawal, sleep disturbances, decreased energy or fatigue, a sense of worthlessness, and an impaired ability to think or make decisions. Dr. Dinwiddie explained, however, that there is a difference between depression and MDD. Depression is an ambiguous term that can refer to a mood state whereas MDD is a specific diagnostic construct that is one of many different recognized mood disorders.

¶ 48     Dr. Dinwiddie denied that Mr. Hull was diagnosed with MDD prior to his termination as a police officer. Although a counselor diagnosed him with the condition, the counselor was not a medical professional. Dr. Dinwiddie pointed out that his counselor, Ms. Jendryka, provided treatment records, not medical records, as she was not a doctoral professional. In addition, although Dr. Hunneke noted some mild to moderate depressive symptoms when he conducted Mr. Hull's fitness for duty evaluation on September 24, 2018, those symptoms did not meet the diagnostic threshold in intensity and number for a diagnosis of MDD.

¶ 49    Dr. Dinwiddie opined that Mr. Hull's psychological condition in September 2018 was not the result of the motor vehicle accident. He explained that any depressive symptoms first manifested a year after the accident and the time lapse made it very difficult to conclude there was any causal relationship. Furthermore, by that time, intervening variables occurred involving his concern about his job security which raised the possibility of a different cause for his anxiety and low mood. Dr. Dinwiddie testified that he had no opinion as to what caused his depression. He stated, "I pointed out that there were other sufficient factors offered much closer in time that would have to be considered whenever trying to piece together a causal relationship between a 2017 incident and a – his depression, roughly, a year-and-a-half or so later."

¶ 50    Dr. Dinwiddie further explained that MDD, regardless of hypotheses regarding cause, tends to occur for the first time in a person's late 20s, which was a factor that had to be considered. Another consideration was that causation of MDD was difficult to determine, but the focus is on events that occurred within the prior six months preceding the first onset of MDD. He stated, "[t]here's no information that I'm aware of that probably counts for more temporally distant causes." The only stressor Dr. Dinwiddie could identify that occurred in the proper time frame for the development of MDD in Mr. Hull's case was his job termination.

¶ 51    Dr. Dinwiddie was asked if he had an opinion, within a reasonable degree of medical certainty, as to whether the motor vehicle accident on September 24, 2017, or any of the effects of that accident, caused or contributed to Mr. Hull's development of MDD. Dr. Dinwiddie replied that he did have an opinion and testified, "[n]o causal relationship at all." He explained his opinion was "primarily because of the lack of temporal connection between the accident and first onset, as

far as we can tell, of any depressive symptomatology. So it would be very difficult to justify any opinion as to causation given that lag of time."

¶ 52    On February 19, 2021, following closing arguments and deliberations, the Pension Board voted to deny Mr. Hull (1) a line-of-duty disability pension based on a neurological condition, (2) a non-duty disability pension based on a neurological condition, and (3) a line-of-duty disability pension based on a psychiatric condition. The Pension Board unanimously voted to grant Mr. Hull a non-duty disability pension based on a psychiatric condition.

¶ 53    On May 5, 2021, the Pension Board issued its 98-page written "Decision and Order" denying Mr. Hull a line-of-duty disability pension but awarding him a non-duty disability pension based on his MDD. The Pension Board expressly stated that it carefully considered all the testimony and the parties' arguments from the hearing and reviewed all the exhibits in the record. For 75 pages, the Pension Board detailed the testimony from the hearing and the medical findings and opinions from the numerous doctors contained in their medical reports and evidence depositions.

¶ 54    As relevant here, the Pension Board found that, although Mr. Hull claimed his MDD resulted, in part, from his "alleged continued struggles with a neurological condition," the evidence showed Mr. Hull was not disabled due to a neurological condition. Therefore, the Pension Board found the cause of Mr. Hull's MDD did not and could not have stemmed from any "legitimate struggles with alleged neurological symptoms" related to the September 24, 2017, accident as "numerous neurologists" concluded he was not disabled and there was no support for Mr. Hull's "alleged subjective neurological symptoms."

¶ 55     The Pension Board further found that the timing of Mr. Hull's "self-reports and eventual diagnoses" of depression did not support a finding that his MDD resulted from or was incurred in the performance of an act of duty. The Pension Board noted that Mr. Hull did not report symptoms of depression to Dr. Senno, Dr. Deutsch, or the medical personnel at Glenbrook Hospital. It was not until February 7, and 8, 2018, when Dr. Guidotti-Breting first observed Mr. Hull demonstrate clinical symptoms of depression.

¶ 56     The Pension Board stated that it accorded "some weight" to Dr. Guidotti-Breting's opinions. It pointed out that she is a neuropsychologist rather than a psychiatrist, and that she determined Mr. Hull met the criteria for an adjustment disorder with mixed anxiety and depressed mood, not MDD. The Pension Board stated that it did not give any weight to Dr. Guidotti-Breting's testimony that Mr. Hull's depression was related to the September 24, 2017, accident as she did not review the treatment records from Dr. Weiss, Dr. Gamze, or Ms. Jendryka. Nor was Dr. Guidotti-Breting aware of Mr. Hull's termination and the subsequent effect it had on his mental health, including his hospitalization.

¶ 57     The Pension Board noted that Mr. Hull did not receive any treatment for his mental health until Dr. Weiss examined him on August 1, 2018. At that time, Mr. Hull reported that he was depressed because he was not working, but he denied feeling anxious. Dr. Weiss diagnosed Mr. Hull with depression on August 22, 2018, but noted his condition later improved while taking Cymbalta. On October 1, 2018, Mr. Hull reported that his depression had improved. However, Mr. Hull also stated that he felt more depressed after he received bad news at work and feared he was going to be terminated.

¶ 58    The Pension Board stated that it gave some weight to the fact that Drs. Deutsch, Guidotti-Breting, and Sherman all concluded that Mr. Hull needed psychiatric treatment. The Pension Board pointed out, however, that Dr. Deutsch opined that Mr. Hull's limitations, including his diagnoses of depression, anxiety, adjustment disorder, and ADHD, were not related to the accident and concussion of September 24, 2017. Dr. Deutsch testified in his evidence deposition that he believed Mr. Hull suffered from depression and anxiety, but that those conditions "are not caused by brain injury or concussions."

¶ 59    The Pension Board further stated that it gave weight to portions of Dr. Hunneke's fitness-for-duty findings. Dr. Hunneke opined that Mr. Hull's emotional reactions and depressive symptoms stemmed from a variety of factors including Mr. Hull's perceived continuation of physical symptoms and his perceived lack of support from the police department and the Village. Dr. Hunneke further opined that the worsening of Mr. Hull's depression could have been a natural consequence of his failure to obtain treatment. The Pension Board agreed with Dr. Hunneke's conclusion that Mr. Hull's depression resulted from and worsened due to a combination of factors.

¶ 60    The Pension Board noted that Mr. Hull did not seek treatment with a counselor until October 3, 2018, when Ms. Jendryka diagnosed him with MDD. The Pension Board further noted that Mr. Hull missed several appointments with Ms. Jendryka. During their sessions, Mr. Hull stated that he felt worthless and betrayed by the police department because it was not helping or supporting him. Mr. Hull stated that he was "ambushed" at the meeting with the Village on November 29, 2018, and that people were hostile towards him.

¶ 61    The Pension Board stated that it gave weight to the treatment records of Dr. Gamze. The Pension Board noted that on October 29, 2018, Mr. Hull told Dr. Gamze that he did not feel

depressed but felt that the police department did not believe him. On January 16, 2019, Mr. Hull told Dr. Gamze that he felt better and that counseling with Ms. Jendryka was helping. Mr. Hull again reported that he did not feel depressed, irritable, or anxious. The Pension Board noted that on January 25, 2019, the Village terminated Mr. Hull's employment.

¶ 62    The Pension Board found that, following the termination, Mr. Hull again became depressed, and the depression substantially worsened. Mr. Hull testified that he attributed his psychological symptoms to his perception of abandonment by the police department, "his" perception that he was not recovering physically, and to financial concerns. In the spring of 2019, Mr. Hull was hospitalized for threatening to commit suicide. The Pension Board quoted lengthy portions of Mr. Hull's testimony from the hearing regarding his termination and hospitalization wherein Mr. Hull expressed feeling "very betrayed and abandoned" by the people to whom he had given his life. Mr. Hull testified that he felt "targeted and attacked" which put him "in a bad place and dark place of worthlessness."

¶ 63    The Pension Board further stated that it gave weight to the independent medical examination reports completed by each of the three psychiatrists, who evaluated Mr. Hull pursuant to section 3-115 of the Pension Code. The Pension Board gave weight to the individual conclusions of Drs. McFaul, Reff, and Dinwiddie, who each opined that Mr. Hull was disabled due to MDD. However, the Pension Board did not give any weight to Dr. McFaul's opinion that Mr. Hull's MDD resulted from the accident on September 24, 2017, because Dr. McFaul did not provide any explanation for his opinion.

¶ 64    The Pension Board noted that Dr. Reff opined that Mr. Hull's MDD did not initially disable Mr. Hull but, rather, it was only after Mr. Hull's termination that his MDD worsened and rendered

him disabled. The Pension Board further noted that Dr. Reff opined that the accident was not the proximate cause of Mr. Hull's disability; however, it contributed to his disability by "setting in motion the cascade of events" that resulted in his termination and ultimately led to his depression.

¶ 65    Thus, the Pension Board found that Dr. Reff's opinion did not support the conclusion that Mr. Hull's MDD was incurred in or resulted from the performance of an act of duty, specifically, the accident on September 24, 2017. Instead, Dr. Reff's opinion established that Mr. Hull's perceptions of abandonment and lack of support caused his depression, and his eventual termination led to the worsening of his depression such that he met the clinical diagnosis for MDD for which he was disabled.

¶ 66    The Pension Board stated that it gave weight to Dr. Dinwiddie's opinion that Mr. Hull's MDD did not result from the accident on September 24, 2017. The Pension Board agreed with Dr. Dinwiddie's opinion that Mr. Hull demonstrated a substantial worsening of depressive symptoms in early 2019 after he was terminated. The Pension Board quoted Dr. Dinwiddie's testimony that the onset of Mr. Hull's MDD was unclear. Dr. Dinwiddie had noted that Mr. Hull reported significant depressive symptoms to Dr. Weiss in August 2018 and to Ms. Jendryka in early October 2018 but reported no such symptoms when he saw Dr. Gamze on October 29, 2018. Dr. Dinwiddie further noted that Mr. Hull reported suicidal ideation to Ms. Jendryka in December 2018 but on January 16, 2019, Dr. Gamze specifically noted an absence of depressive symptoms. Thereafter, Mr. Hull was terminated, and by Mr. Hull's own account, his depressive symptoms substantially worsened in February 2019. Dr. Dinwiddie had stated that, given the inconsistency of Mr. Hull's reported symptoms, prior to his termination, his condition "would likely <u>not</u> have been disabling." (Emphasis in original.)

¶ 67 The Pension Board stated that it adopted the opinions of Drs. Reff and Dinwiddie that Mr. Hull's depression was not disabling until after he was terminated, at which point his depression worsened and met the diagnosis for MDD. The Pension Board quoted Dr. Dinwiddie's statement that Mr. Hull's MDD "manifested, at the earliest, nearly a year after the 9/24/2017 incident, thus making a causal connection unlikely." Dr. Dinwiddie further opined that the accident did not cause or contribute to Mr. Hull's disability.

¶ 68 Based on all the evidence, the Pension Board concluded that Mr. Hull was disabled due to MDD but that his MDD did not result from and was not incurred in the performance of an act of duty on September 24, 2017. Accordingly, the Pension Board denied Mr. Hull a line-of-duty disability pension based on a psychiatric condition and granted him a non-duty disability pension based on his MDD.

¶ 69 On June 4, 2021, Mr. Hull filed a complaint in the circuit court of Cook County for administrative review of the Pension Board's decision. Mr. Hull argued that the Pension Board's determination that his disability did not result from an act of duty was arbitrary and capricious, against the manifest weight of the evidence, and clearly erroneous. On July 14, 2023, the circuit court found that there was competent evidence to support the Pension Board's decision and denied Mr. Hull's request to reverse the ruling. On August 11, 2023, Mr. Hull filed his notice of appeal.

¶ 70                                      ANALYSIS

¶ 71 We note that we have jurisdiction to consider these matters, as Mr. Hull filed a timely notice of appeal following the trial court's judgment. See Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 72    On appeal, Mr. Hull contends that the Pension Board's denial of a line-of-duty disability pension based on his MDD was against the manifest weight of the evidence because its decision relied solely on the "erroneous, contradictory, and unsupported opinions" of Dr. Dinwiddie and disregarded the opinions of Drs. Reff and McFaul who found the accident directly caused his MDD. Mr. Hull argues that Dr. Dinwiddie failed to consider or base his opinion on the relevant and material evidence. He claims his medical records show he experienced an onset of depression shortly after the accident and, thus, the evidence showed he suffered from the condition long before he was terminated. He points out that Dr. Dinwiddie testified that he had no opinion as to the cause of his MDD. He also argues that Dr. Dinwiddie's opinion is flawed because he failed to consider that Mr. Hull had to wait several months to see Dr. Weiss to obtain the necessary treatment because the Village refused to authorize the treatment.

¶ 73    The Pension Code provides that judicial review of pension board decisions is governed by the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). 40 ILCS 5/3-148 (West 2020); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531-32 (2006). Under the Administrative Review Law, this court reviews the final decision of the administrative agency, here the Pension Board, rather than the circuit court's judgment. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 551-52 (2009).

¶ 74    Section 3-114.1(a) of the Pension Code provides, in relevant part, that a police officer is entitled to receive a line-of-duty disability pension if he is found to be physically or mentally disabled for service in the police department "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty." 40 ILCS 5/3-114.1(a) (West 2020). Section 3-114.2 of the Pension Code provides for a similar, but lower, disability pension for a police officer

"who becomes disabled as a result of any cause other than the performance of an act of duty." 40 ILCS 5/3-114.2 (West 2020).

¶ 75    Whether a plaintiff's disability was caused by an incident that occurred in the line of duty is a factual determination. *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 22. In administrative proceedings, the burden of proof is on the plaintiff, and if he fails to meet that burden, relief will be denied. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*, 234 Ill. 2d 446, 464 (2009). To receive a line-of-duty pension, a plaintiff need not prove that a duty-related accident is the sole or primary cause of his disability. *Carrillo*, 2014 IL App (1st) 130656, ¶ 23. Rather, a plaintiff needs to prove that the duty-related accident was a causative factor that contributed to his disability. *Id.* In other words, there must be a "sufficient nexus" between the disability and the performance of the duty. *Barber v. Board of Trustees of Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818 (1993), *overruled in part on other grounds by Kouzoukas*, 234 Ill. 2d 446.

¶ 76    An administrative agency's factual findings and conclusions are held to be *prima facie* true and correct (735 ILCS 5/3-110 (West 2020)) and will not be disturbed on review unless they are against the manifest weight of the evidence. *Kouzoukas*, 234 Ill. 2d at 463. An agency's factual determinations are against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). It is the Pension Board's duty, as the fact finder, to assign the appropriate weight to the evidence, resolve conflicts in the evidence, and determine the credibility of the witnesses. *Scatchell v. Board of Fire & Police Commissioners for Melrose Park*, 2022 IL App (1st) 201361, ¶ 36.

¶ 77    When reviewing the Pension Board's factual findings, this court will not reweigh the evidence or substitute its judgment for that of the Board. *Cinkus*, 228 Ill. 2d at 210. Where the record contains evidence that supports the Pension Board's decision, that decision should be affirmed. *Marconi*, 225 Ill. 2d at 534. "Therefore, the 'mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings.' " *Id.* (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)).

¶ 78    In cases involving psychological disabilities, courts have required plaintiff-police officers to demonstrate that their disabilities result from specific, identifiable acts of duty unique to police work. *Robbins v. Board of Trustees of Carbondale Police Pension Fund*, 177 Ill. 2d 533, 542 (1997). Where a disability stems only from the general nature of being a police officer rather than a specific act of service, a line-of-duty disability pension is denied. *Id.* "Similarly, where the causes of the stress are not unique to police work, line-of-duty disability pensions are also denied." (Internal quotation marks omitted.) *Id.*

¶ 79    In *Robbins*, the supreme court relied on the language of the Pension Code and explained, "[c]ourts reason that civilians regularly suffer stress in many aspects of their jobs. Thus, to be eligible for a line-of-duty disability pension based on stress, a police officer's psychological disability must result from 'a special risk, not ordinarily assumed by a citizen in the ordinary walks of life.' " (Internal quotation marks omitted.) *Id.* (quoting *Olson v. City of Wheaton Police Pension Board*, 153 Ill. App. 3d 595, 599 (1987) (quoting 40 ILCS 5/5-113 (West 1994))).

¶ 80    Here, the record reveals that the Pension Board's decision denying Mr. Hull a line-of-duty disability pension based on his MDD was not against the manifest weight of the evidence. Mr.

Hull's assertion that the Pension Board relied solely on Dr. Dinwiddie's opinions and disregarded the opinions of Drs. Reff and McFaul is belied by the record. In its lengthy written decision, the Pension Board stated that it carefully considered all the testimony and the parties' arguments at the hearing and reviewed all the information contained in the voluminous exhibits in reaching its decision. Therein, the Pension Board detailed the testimony from the hearing as well as the medical findings and opinions from numerous doctors contained in the medical reports and evidence depositions.

¶ 81     The Pension Board expressly stated that it gave weight to the independent medical examination reports completed by each of the three psychiatrists and agreed with their unanimous conclusions that Mr. Hull was disabled due to MDD. The Pension Board explained that it did not give any weight to Dr. McFaul's opinion that Mr. Hull's MDD was "directly related" to the motor vehicle accident because the doctor failed to provide any explanation for his opinion even though the questionnaire specifically asked him to do so.

¶ 82     The record further shows that the Pension Board found that Dr. Reff's opinion did not establish that Mr. Hull's MDD resulted from the accident. The Pension Board considered Dr. Reff's opinion that the accident was not the proximate cause of Mr. Hull's disability but that it contributed to his disability by "setting in motion the cascade of events" that resulted in his termination and ultimately led to his depression. The Pension Board noted that Dr. Reff opined that Mr. Hull's MDD did not initially disable him but, rather, it was only after Mr. Hull's termination that his MDD worsened and rendered him disabled. Accordingly, the Pension Board expressly found that Dr. Reff's opinion did not support the conclusion that Mr. Hull's MDD was incurred in or resulted from the accident. Instead, Dr. Reff's opinion established that Mr. Hull's

perceptions of abandonment and lack of support caused his depression, and his eventual termination led to the worsening of his depression such that he met the clinical diagnosis for MDD for which he was disabled.

¶ 83    In addition, the record shows that the Pension Board also considered the opinions of other doctors in reaching its determination that Mr. Hull's MDD was not a result of the accident. The Pension Board pointed out that Dr. Guidotti-Breting found that Mr. Hull suffered from an adjustment disorder with mixed anxiety and depressed mood, not MDD. The Pension Board stated that it did not give any weight to Dr. Guidotti-Breting's testimony that Mr. Hull's depression was related to the accident because she did not review the treatment records from Dr. Weiss, Dr. Gamze, or Ms. Jendryka. Nor was Dr. Guidotti-Breting aware of Mr. Hull's termination and the subsequent effect it had on his mental health, including his hospitalization.

¶ 84    The Pension Board also pointed out that Dr. Deutsch opined that Mr. Hull's diagnoses of depression, anxiety, adjustment disorder, and ADHD were not related to the accident as those conditions "are not caused by brain injury or concussions." The Pension Board agreed with Dr. Hunneke's opinion that Mr. Hull's depression resulted from a variety of factors including his perceived continuation of physical symptoms and perceived lack of support from the police department and the Village. The Pension Board also considered Mr. Hull's testimony that his psychological symptoms stemmed from his perception of abandonment by the police department, "his" perception that he was not recovering physically, and his financial concerns.

¶ 85    The record thereby shows that the Pension Board did not disregard the opinions of the other doctors. Instead, the Pension Board considered the opinions of numerous doctors as well as Mr. Hull's testimony to reach its determination that Mr. Hull's MDD was not a result of the accident.

¶ 86    We find Mr. Hull's claim that Dr. Dinwiddie's opinions were erroneous, contradictory, and unsupported by the evidence unpersuasive. Dr. Dinwiddie noted that psychological symptoms were not prominent when Mr. Hull sustained his concussion following the accident. He further noted specific dates that Mr. Hull reported depressive symptoms to Dr. Weiss and Ms. Jendryka, as well as subsequent dates when Dr. Gamze noted an absence of depressive symptoms. Dr. Dinwiddie acknowledged that Mr. Hull's medical records showed Mr. Hull demonstrated many symptoms of depression. He noted that Dr. Hunneke observed some mild to moderate depressive symptoms during Mr. Hull's fitness for duty evaluation. Dr. Dinwiddie stated that Mr. Hull's medical history and Mr. Hull's own account showed that his depressive symptoms substantially worsened around February of 2019, following Mr. Hull's termination from the police department. Thus, contrary to Mr. Hull's assertions, the record shows that in addition to his evaluation of Mr. Hull, Dr. Dinwiddie thoroughly reviewed and considered Mr. Hull's medical history in detail and rendered opinions that were based on the relevant evidence.

¶ 87    Moreover, the record shows that, in addition to the evidence from the other doctors discussed above, Dr. Dinwiddie's report and testimony strongly supported the Pension Board's decision that Mr. Hull's MDD did not result from the motor vehicle accident. Dr. Dinwiddie found that the onset of Mr. Hull's MDD was unclear. He noted that Mr. Hull reported significant depressive symptoms to Dr. Weiss on August 1, 2018, and was prescribed an antidepressant. However, in the following months, there was an inconsistency of reported symptoms to Drs. Weiss and Gamze. After Mr. Hull's termination, his depressive symptoms substantially worsened around February of 2019. Dr. Dinwiddie opined that the inconsistency of reported symptoms indicated

that Mr. Hull's depressive condition prior to his termination "would likely not have been disabling."

¶ 88    In his report and testimony, Dr. Dinwiddie repeatedly opined that Mr. Hull's MDD was not caused by the accident. He stated in his report, "it appears that low mood and symptoms of Major Depressive Disorder manifested, at the earliest, nearly a year after the 9/24/2017 incident, thus making a causal connection unlikely." Instead, Dr. Dinwiddie opined that stressors associated with the onset of Mr. Hull's depressive episode appeared to be "related to the anticipation of, and later occurrence of, his job termination."

¶ 89    Significantly, Dr. Dinwiddie explained that there is a difference between depression and MDD. Depression is an ambiguous term that can refer to a mood state whereas MDD is a specific diagnostic construct that is one of many different recognized mood disorders. Dr. Dinwiddie denied that Mr. Hull was diagnosed with MDD prior to his termination. Although Mr. Hull demonstrated some mild to moderate depressive symptoms during his fitness for duty evaluation on September 24, 2018, those symptoms did not meet the diagnostic threshold in intensity and number for a diagnosis of MDD.

¶ 90    Dr. Dinwiddie further explained that, where Mr. Hull's depressive symptoms first manifested a year after the accident, the time lapse made it very difficult to conclude there was any causal relationship to the accident. In addition, by September 2018, intervening variables had occurred involving Mr. Hull's concern about his job security which raised the possibility of a different cause for his anxiety and low mood. He testified, "there were other sufficient factors offered much closer in time that would have to be considered whenever trying to piece together a

causal relationship between a 2017 incident and a – his depression, roughly, a year-and-a-half or so later."

¶ 91     In addition, Dr. Dinwiddie explained that, although causation of MDD was difficult to determine, the focus is on events that occurred within the prior six months preceding the first onset. He testified, "[t]here's no information that I'm aware of that probably counts for more temporally distant causes." The only stressor Dr. Dinwiddie could identify that occurred in the proper time frame for the development of MDD in Mr. Hull's case was his job termination. Dr. Dinwiddie testified that his opinion as to whether the accident, or any effects of the accident, caused or contributed to Mr. Hull's development of MDD was that there was "[n]o causal relationship at all."

¶ 92     Based on this record, we find the evidence was sufficient to support the Pension Board's factual finding that Mr. Hull's MDD was not caused by the motor vehicle accident and, thus, that finding was not against the manifest weight of the evidence. *Kouzoukas*, 234 Ill. 2d at 463. Mr. Hull's argument that Dr. Dinwiddie's opinions were not credible and were contrary to the opinions of other doctors is tantamount to requesting this court to reweigh the evidence and substitute our judgment for that of the Pension Board, which we will not do. *Cinkus*, 228 Ill. 2d at 210. Because Mr. Hull's MDD did not result from the accident, Mr. Hull was not entitled to receive a line-of-duty disability pension. 40 ILCS 5/3-114.1(a). Therefore, the Pension Board's decision denying Mr. Hull a line-of-duty pension is affirmed. *Marconi*, 225 Ill. 2d at 534.

¶ 93     In reaching this conclusion, we find no merit in Mr. Hull's alternative argument that the Board's decision denying him a line-of-duty pension is clearly erroneous. Mr. Hull argues that the accident was a "contributing cause" to his development of MDD and relies on Dr. Reff's opinion

that the accident set in motion "the cascade of events" that led to his depression. Mr. Hull asserts that he was terminated in part due to his inability to perform his job duties, which was due to his continuing symptoms from the accident. He also claims that the Pension Board ignored the fact that he learned his wife was pregnant the same month he was terminated, and he questioned his ability to become a good father due to his ongoing symptoms from the accident.

¶ 94     Mr. Hull asserts that his alternative argument presents a mixed question of fact and law as to whether the facts, as found by the Pension Board, satisfied the standard for awarding a line-of-duty disability pension and, therefore, the clearly erroneous standard of review applies. See *Kouzoukas*, 234 Ill. 2d at 463. Mr. Hull states, "[i]n the present case, the facts are not in dispute and therefore, the clearly erroneous standard is the applicable standard of review."

¶ 95     As explained above, whether Mr. Hull's MDD was caused by the accident was a factual determination (*Carrillo*, 2014 IL App (1st) 130656, ¶ 22), subject on review to the manifest weight of the evidence standard (*Kouzoukas*, 234 Ill. 2d at 463). The factual dispute is the issue of this appeal. Mr. Hull's alternative argument merely reargues the factual issue. Thus, the clearly erroneous standard is inapplicable to this case and Mr. Hull's "alternative" argument has no merit.

¶ 96                             CONCLUSION

¶ 97     For these reasons, we affirm the judgment of the circuit court of Cook County, which affirmed the decision of the Pension Board denying Mr. Hull a line-of-duty disability pension based on his MDD.

¶ 98     Affirmed.